Argued and submitted September 13, 2005, peremptory writ to issue
August 31, 2006

Phil DREYER,
Frank Gearhart and Kafoury Bros. LLC,
an Oregon limited liability corporation,
and as potential class representatives,
*Plaintiffs-Adverse Parties,*

*v.*

PORTLAND GENERAL ELECTRIC COMPANY,
*Defendant-Relator.*

(CC 03 C10639; SC S52217)

Patricia MORGAN,
an individual,
and as representative of the
class of similarly situated
electric service customers of
Portland General Electric Company
between certain periods of time,
*Plaintiff-Adverse Party,*

*v.*

PORTLAND GENERAL ELECTRIC COMPANY,
*Defendant-Relator.*

(CC 03 C10640; SC S52284)
(Cases Consolidated for Briefing and Decision Only)

142 P3d 1010

See also 154 Or App 702, 962 P2d 744.

Barbee B. Lyon, of Tonkin Torp LLP, argued the cause and filed the briefs for defendant-relator.

Daniel W. Meek and Linda K. Williams argued the cause and filed the brief for plaintiffs-adverse parties. With them on the brief was Phil Goldsmith.

Mark McDougal, filed the brief for *amicus curiae* Utility Reform Project.

James N. Westwood, of Stoel Rives LLP, filed the briefs for *amici curiae* Northwest Natural Gas Company, Edison Electric Institute, PacifiCorp, Idaho Power Company, and Avista Corporation.

Erika L. Hadlock, Assistant Solicitor General, filed the brief for *amicus curiae* State of Oregon. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Paul A. Graham, Assistant Attorney General.

Before Carson,** Chief Justice, and Gillette, Durham, Riggs, De Muniz,*** Balmer, and Kistler, Justices.

GILLETTE, J.

---

\** Chief Justice when case was argued.

\*** Chief Justice when decision was rendered.

## GILLETTE, J.

In these consolidated actions against defendant Portland General Electric Company (PGE) brought by current and former customers of that utility, PGE asks this court to issue writs of mandamus ordering the Marion County Circuit Court to dismiss plaintiffs' actions and to vacate an order certifying plaintiffs as a class. PGE contends, among other things, that the circuit court lacks jurisdiction to hear the actions because the cases necessarily involve rate-setting, a function that the legislature has delegated exclusively to the Oregon Public Utility Commission (the PUC). Although we reject PGE's contention that the actions must be dismissed, we conclude that they should be abated, at least until the PUC responds to certain remands from the Marion County Circuit Court in related cases, because the PUC's disposition of those remanded cases may negate some of or all the damages that plaintiffs now claim. We issue a writ of mandamus accordingly.

The actions arose out of a longstanding controversy over one of PGE's former generating facilities, the Trojan nuclear power plant. When Trojan first went into service in 1976, the PUC set PGE's rates in a way that allowed it to recover its investment in Trojan over a 35-year period. However, the plant was plagued with technical problems and breakdowns, and PGE finally closed it in 1993—long before PGE had recouped its investment.

By the time that Trojan was shut down, the legislature had enacted a statute that allowed utilities to charge rates that included their "undepreciated investment" in a retired plant—if the PUC found the closure to be in the public interest.[1] PGE sought to take advantage of that provision and

---

[1] The statute, ORS 757.140(2), provides:

"In the following cases the commission may allow in rates, directly or indirectly, amounts on the utility's books of account which the commission finds represent undepreciated investment in a utility plant, including that which has been retired from service:

"(a) When the retirement is due to ordinary wear and tear, casualties, acts of God, acts of governmental authority; or

"(b) When the commission finds that the retirement is in the public interest."

therefore argued to the PUC that closing Trojan (and replacing it with power purchased from outside sources) was in the public interest because it was the "least cost" alternative for providing power to PGE's customers.

In 1993, the PUC issued an order finding that PGE's decision to close Trojan under a "least cost" theory was "reasonable." PUC Order No. 93-804. However, it reserved for a later proceeding the question of how to adjust PGE's rates to deal with the closure. Shortly thereafter, PGE filed a request with the PUC pursuant to ORS 756.450 (1993),[2] asking that body to issue a declaratory ruling as to the propriety of charging the undepreciated portion of its Trojan investment to PGE's ratepayers. The PUC opened a proceeding to consider that question, and two public interest groups—the Citizens' Utility Board of Oregon (CUB) and the Utility Reform Project (URP)—intervened. Relying on ORS 757.355 (1993), a statute that Oregon voters had approved in 1978 as a ballot initiative,[3] CUB argued that PGE could *not* include a return *on* its Trojan investment in its rate base, even if ORS 757.140(2) permitted it to recover its undepreciated investment in the plant in its rates. URP argued further that ORS 757.355 (1993) barred PGE from including *any* aspect of its Trojan investment in its rates.

---

[2] At the relevant time, *i.e.*, 1993, ORS 756.450 provided:

"On petition of any interested person, the Public Utility Commission may issue a declaratory ruling with respect to the applicability to any person, property, or state of facts of any rule or statute enforceable by the commission. A declaratory ruling is binding between the commission and the petitioner on the state of facts alleged, unless it is modified, vacated or set aside by a court. However, the commission may review the ruling and modify, vacate or set it aside if requested by the petitioner or other party to the proceeding. Binding rulings provided by this section are subject to review in the circuit court in the manner provided in ORS 756.580."

In 2005, the legislature amended ORS 756.450. Or Laws 2005, ch 638, § 2. The amendments are not relevant to the case at hand.

[3] ORS 757.355 (1993) provided:

"No public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer."

In 2003, the legislature amended ORS 757.355. Or Laws 2003, ch 202, § 2. The amendments are not relevant to the case at hand.

At the end of that proceeding, the PUC issued PUC Order No. 93-1117. The order rejected both CUB's and URP's arguments and declared that, *if* PGE met certain conditions and could show certain "assumed facts" to be true in a rate case or similar forum,[4] then PGE could set rates to obtain both a "return of" and a "return on" its Trojan investment.[5] The PUC also announced that it considered its decision to be binding and that, in any future PGE rate case, it would consider *only* whether PGE had proven the "assumed facts" that it had identified. CUB and URP unsuccessfully sought reconsideration of the ruling and then sought review in the Marion County Circuit Court. After the circuit court summarily affirmed, CUB and URP appealed.

Shortly thereafter, the PUC conducted a rate case in which PGE submitted evidence to prove the "assumed facts" that the PUC had identified and to show that it had met the required conditions. CUB and URP both intervened in that case, arguing, respectively, that PGE could not include a return on its investment in its rate base and that PGE could not include *any* aspect of its Trojan investment in its rate base. After a hearing, the PUC issued PUC Order No. 95-322, which generally allowed PGE to include in its rate base (and amortize, through its rates, over the next 16 years) the amount that it had identified as the unrecovered portion of its original Trojan investment.[6] The PUC also allowed PGE to include a return on that investment in its new rates. Consistent with its comments in PUC Order No. 93-1117, the PUC refused to consider any argument that ORS 757.355 (1993) barred "return of" or "return on" investments in a retired plant.

The rates approved in PUC Order No. 95-322 went into effect immediately—even as CUB and URP filed an

---

[4] PGE would have to show, among other things, that closing Trojan was the least-cost option and that PGE's investments in Trojan since 1992 had been precedent and necessary.

[5] The PUC based its decision, in part, on Oregon Attorney General Opinion No. 6454 (June 8, 1992), which opined that ORS 757.355 was directed at the planning and construction phases of plants that were not yet on line, and had no application to plants that had been retired from service.

[6] The PUC disallowed certain costs that PGE had claimed in its rate proposal on the ground that PGE had acted imprudently in incurring those costs.

action against the PUC in Marion County Circuit Court, seeking to "modify, vacate or set aside" the order pursuant to *former* ORS 756.580 (1993).[7] After hearing the evidence and arguments, the circuit court adopted CUB's position that PGE was not entitled to include a "return on" its Trojan investment in its rates, and reversed. This time the PUC appealed, and that appeal was consolidated with CUB's and URP's earlier appeal from PUC Order No. 93-1117, which raised similar, if not identical, issues.[8]

In *Citizens' Utility Board v. PUC*, 154 Or App 702, 962 P2d 744 (1998), the Court of Appeals affirmed the circuit court's decision against the PUC in the rate case and reversed the circuit court's decision affirming the PUC in the declaratory ruling case. The court rejected the theory advanced by PGE and the PUC—that ORS 757.355 (1993) is inapplicable to retired plants and therefore has no relevance to the issue of the rate treatment of Trojan. The court also rejected PUC's and PGE's position that ORS 757.140(2) supersedes the earlier statute. *Id.* at 708-13. The court concluded, instead, that ORS 757.140(2) and ORS 757.355 (1993) must be read together, that ORS 757.140(2) permits rates necessary to compensate utilities for the *principal* amount of their undepreciated investment in a retired facility in some circumstances, but that ORS 757.355 (1993) absolutely precludes utilities from including in their rates a return on their investment in unused or retired property. *Id.* at 716.

---

[7] *Former* ORS 756.580 (1993) was repealed by the legislature in 2005. Or Laws 2005, ch 638, § 21. It provided, in part:

"(1) A party to any proceeding before the Public Utility Commission, when aggrieved by any findings of fact, conclusion of law or order, including the dismissal of any complaint or application by the commission, may prosecute a suit against the commission to modify, vacate or set aside such findings of fact, conclusions of law or order."

[8] Within eight months of issuing PUC Order No. 95-322, the PUC approved a new tariff schedule for PGE in PUC Order No. 95-1216. That schedule was superseded in turn by the tariff schedule adopted in PUC Order No. 96-306. In PUC Order No. 95-1216, the PUC reiterated its position that PUC Order No. 93-1117 disposed of the issue of PGE's entitlement to a return on its Trojan investment and that it would not reconsider the issue. Neither CUB nor URP sought judicial review of PUC Order No. 95-1216 or 96-306.

After thus losing in the Court of Appeals, PUC and PGE sought review in this court. This court granted the petition for review in 1999. 328 Or 464, 987 P2d 513 (1999). However, the court held the case in abeyance when certain events occurred that appeared to have some potential for resolving the controversy without the court's participation. First, the PUC sought express authorization from the legislature (in House Bill (HB) 3220 (1999)) to structure rates to allow utilities a return on investments in plants retired in the public interest. The bill passed in the legislature, but was referred to the people, who rejected it in the November 2000 election. Second (and before the fate of HB 3220 was decided in the election), PGE and CUB entered into a settlement agreement that purported to "put an end to the controversial 'return on' Trojan by wiping the unrecovered Trojan balance off the books." The settlement involved offsetting PGE's remaining Trojan investment balance (by then, $180.5 million) and certain tax liabilities relating to Trojan, against certain existing balances running in favor of PGE's ratepayers."[9] After CUB agreed to the settlement, PGE applied to the PUC for an accounting order and revised rate schedules implementing the settlement. PUC approved PGE's request on September 29, 2000 (PUC Order No. 00-601), and the new rates went into effect immediately. Thus, as of October 1, 2000, PGE's rates no longer purported to include any amount relating to the utility's former Trojan investment.

After the PUC approved the settlement and the new rate schedules implementing it, PGE moved this court to dismiss the petition for review in *Citizens' Utility Board* and to vacate the decisions below. PGE argued that the settlement rendered the controversy moot. URP, however, objected to

---

[9] Specifically, the settlement offset the $180.5 million that purportedly still had not been collected on PGE's Trojan investment balance plus a $47.4 million "FAS 109" asset (which customers supposedly owed to PGE for accelerated tax deductions that PGE passed through to customers early in Trojan's life) against (1) a "new regulatory asset" to recover FAS 109 amounts; (2) 45 percent of the proceeds from certain insurance policies; and (3) $161.9 million in credits owed by PGE to ratepayers, which apparently had arisen out of the 1996 sale of PGE to Enron, a now-defunct Texas conglomerate. Although URP opposed various aspects of the settlement, its primary focus was on PGE's selection of $180.5 million as the remaining balance. It argued that most of that amount reflected projected return on the Trojan investment until 2011.

the motion. This court ultimately denied PGE's motion to dismiss and vacate, but nevertheless chose to dismiss the petition for review on its own motion. 335 Or 91, 58 P3d 822 (2002).

The foregoing procedural history left the Court of Appeals 1998 decision in *Citizens' Utility Board* as the ultimate decision in the case. The Court of Appeals issued an appellate judgment in accordance with that decision on January 8, 2003. The Marion County Circuit Court received that appellate judgment in the fall of 2003 and remanded to the PUC at that time "for further proceedings consistent with the opinion and orders of the Court of Appeals."

In the meantime, URP had initiated a proceeding in the PUC to challenge PUC Order No. 00-601, described above. URP argued that the CUB/PUC settlement that PUC Order No. 00-601 implemented was unsatisfactory in that it provided only *prospective* relief to ratepayers—that is, it provided no mechanism for returning to ratepayers money that PGE had collected unlawfully between 1995 and 2000 as a "return on" its Trojan investment. URP also argued, in a related vein, that, even if the settlement *formally* removed Trojan from the accounting/ratemaking process, it still provided PGE with the "functional equivalent" of a return on its Trojan investment—an outcome that the Court of Appeals decision in *Citizens' Utility Board* prohibits.

The PUC rejected those arguments in PUC Order No. 02-227. The PUC responded, first, that it lacked authority to order refunds or otherwise to restore to ratepayers the part of PGE's earlier rates that provided a return on PGE's Trojan investment. The PUC relied, in that regard, on a principle known as the "filed rate doctrine" and on a corollary rule against retroactive ratemaking.[10] The PUC also argued that

---

[10] The "filed rate doctrine" holds, generally, that any rate filed with and approved by the relevant ratemaking agency represents a contract between the utility and the customer and is conclusively lawful until a new rate is approved. The corollary "rule against retroactivity" holds that approved utility rates may be modified only prospectively and that utilities cannot provide retrospective relief from such rates.

No Oregon court has expressly decided whether Oregon accepts the filed-rate doctrine or the corollary rule against retroactive ratemaking. However, the PUC long has argued that the two doctrines apply and the Oregon Attorney General has

nothing in *Citizens' Utility Board* precluded the solution that PGE and CUB had settled upon and that, in any event, the proposed rates were in the public interest and resulted in "just and reasonable rates." Notably, the PUC appeared to acknowledge that the settlement "preserve[d] the outcome" approved in PUC Order No. 95-322, the order that specifically was overturned in *Citizens' Utility Board*.

After an unsuccessful bid for reconsideration of the order approving and implementing the CUB/PGE settlement, URP filed an action against the PUC in Marion County Circuit Court, seeking review of the order pursuant to ORS 756.580. URP argued, as it had before the PUC, that the new rates were unlawful in that they failed to account for amounts that ratepayers already (and illegally) had been required to pay to PGE, in part as a return on the PGE's Trojan investment. In a decision issued on November 7, 2003, the circuit court agreed, holding that there was no logical or legislative support for the PUC's view that the "filed rate doctrine" absolutely precludes the PUC from in any way refunding to ratepayers amounts collected by a utility pursuant to a rate that a court later declares unlawful on judicial review. The circuit court concluded that "PGE should have been required to account for all refunds due to rate payers for these unlawfully collected rates as a matter of law." Accordingly, the circuit court reversed and remanded to the PUC

concurred in that position. Letter of Advice dated March 18, 1987, to Charles Davis, Public Utility Commissioner (op-6076). Both the PUC and the Attorney General suggest that there are strong policy considerations underpinning the two doctrines. The PUC also contends that the doctrines inhere in an Oregon statute, ORS 757.225. That statute provides:

"No public utility shall charge, demand, collect or receive a greater or less compensation for any service performed by it within the state, or for any service in connection therewith, than is specified in printed rate schedules as may at the time be in force or demand, collect, or receive any rate not specified in such schedule. *The rates named therein are the lawful rates until they are changed as provided in ORS 757.210 to 757.220.*"

(Emphasis added.)

In its briefs to this court, PGE asserts that *McPherson et al v. Pacific P. & L. Co.*, 207 Or 433, 296 P2d 932 (1956), implicitly adopts the filed-rate doctrine, but the validity of that assertion is debatable. Certainly, *McPherson* does not adopt any rule about retroactive ratemaking. In any event, our disposition of this case eliminates any need to address the issue in this opinion.

"with directions to immediately revise and reduce the exist-
ing rate structure so as to fully and promptly offset and
recover all past improperly calculated and unlawfully col-
lected rates, or alternatively, to order PGE to immediately
issue refunds for the full amount of all excessive and unlaw-
ful charges collected by the utility for a return on its Trojan
investment as previously determined to be improper by
both this Court and the Court of Appeals."

The PUC responded to the circuit court's decision
and remand on two fronts. First, the PUC appealed, arguing
that, contrary to the circuit court's decision and remand,
(1) the statutes do not authorize the PUC to order refunds or
otherwise engage in retroactive ratemaking; (2) the remand
in *Citizens' Utility Board* did not require and could not
authorize the PUC to order a refund or otherwise engage in
retroactive ratemaking; and (3) the rates approved in PUC
Order No. 02-227 were reasonable and supported by substan-
tial evidence. That appeal presently is pending in the Court
of Appeals.

Secondly, the PUC decided immediately to respond
to the circuit court's remand in a hybrid proceeding that
would consider both that remand and the remand that it
recently had received from the circuit court in the *Citizens'
Utility Board* case. Over URP's objection, the PUC decided to
proceed with the two remands together, but in two phases,
with the first phase devoted to determining "[w]hat rates
would have been approved in [PUC Order No. 95-322] if ORS
757.355 [(1993)] had been interpreted to prohibit a return on
Trojan," and the second phase devoted to reconciling the
results of Phase I with the rates that actually were approved.
PUC Order No. 04-597 at 2, 7 (Oct 18, 2004).[11] The PUC pres-
ently is proceeding with Phase I.

_____
[11] The PUC acknowledged that the first phase would involve ratemaking but
noted that it would not be necessary to duplicate the complete 1995 rate case.
Rather, the ratemaking process would be limited to those aspects of the 1995 case
that are affected by the Court of Appeals' statutory interpretation of ORS 757.355
(1993)—specifically

"(1) the appropriate recovery period for the Trojan investment balance;
(2) the cost of capital effects of the utility's change of circumstances; and (3) the
application of the net benefits formula given that PGE is precluded from recov-
ering the cost of capital represented by the Trojan investment."

PUC Order No. 04-597 at 6-7.

That brings us to the present case. On January 23, 2003, two weeks after the Court of Appeals issued the appellate judgment in *Citizens' Utility Board* and before the PUC opened the hybrid proceeding described above, certain past and present ratepayers of PGE filed complaints against PGE in Marion County Circuit Court, seeking refunds of all amounts that ratepayers unlawfully had to pay between April 1, 1995 (the effective date of PUC Order No. 95-322) and October 1, 2000 (when PUC Order No. 00-601 came into effect) to provide PGE with a return on its Trojan investment.[12] Plaintiffs, who are represented by lawyers who also represented URP before the PUC and in the judicial review proceedings described above, sought certification as a class and sought relief in four separate claims.

In their first claim, plaintiffs alleged that they were entitled to return of the unlawful charges under ORS 756.185. That statute provides, in part:

---

URP intervened in the proceeding and argued that the PUC's framing of the issues was improper in that it directly involved engaging in retroactive ratemaking. URP also argued that, unless the PUC repudiated its position that the filed rate doctrine precluded it from providing any relief for the unlawful charges that PGE had collected, the proceedings were "futile" and "moot." The PUC acknowledged URP's position, stating that

"the uncertainty of the outcome of Phase I is one reason these remand proceedings may proceed despite the ongoing appeal of one of the underlying dockets, [PUC Order No. 02-227] at the Court of Appeals. URP expresses concerns that these remand proceedings are 'pointless,' 'meaningless,' and 'moot,' speculating that relief cannot be granted due to the [PUC's] legal position [in the appeal concerning PUC Order No. 02-227] that refunds violate the rule against retroactive ratemaking. As the Ruling observed, however, the [PUC's] legal position that it is not authorized to issue refunds is not necessarily implicated in the first phase. We agree that 'prior to completing the investigation of what rate determinations would have been made by the [PUC] under the statutory framework provided by the Court of Appeals, it is impossible to know whether any retroactive adjustment of rates will be necessary.' "

*Id.* at 7.

The PUC concluded, however, that it must proceed because it could not avoid, modify or otherwise dispense with the obligations imposed by reviewing courts. *Id.* at 8.

[12] Originally, two different sets of plaintiffs filed actions asserting essentially identical claims, the only difference being that plaintiffs in *Dreyer et al v. PGE* (Marion County Circuit Court Case No. 03 10639) alleged that they were *present* customers of PGE while plaintiffs in *Morgan v. PGE* (Marion County Circuit Court Case No. 03 10640) alleged that they were *former* PGE customers. Early on, the trial court consolidated *Morgan* with *Dreyer*.

"(1)   Any public utility which does, or causes or permits to be done, any matter, act or thing prohibited by ORS chapter 756, 757 or 758 or omits to do any act, matter or thing required to be done by such statutes, is liable to the person injured thereby in the amount of damages sustained in consequence of such violation. * * * Except as provided in subsection (2) of this section, the court may award reasonable attorney fees to the prevailing party in an action under this section.

"(2)   The court may not award attorney fees to a prevailing defendant under the provisions of subsection (1) of this section if the action under this section is maintained as a class action pursuant to ORCP 32."

Plaintiffs alleged that PGE had done something "prohibited by * * * ORS [chapter] 757" by receiving from customers payments "which are derived from a rate base which includes within it any * * * installation * * * not presently used for providing utility service." ORS 757.355 (1993). Plaintiffs further alleged that they and other ratepayers were damaged in an amount equal to the unlawful charges.

In their second claim, plaintiffs alleged that PGE violated ORS 757.225 by (1) "directly charging and collecting charges for service which was not rendered"; and (2) "including charges on bills which were in excess of lawful charges in rates." ORS 757.225 provides, generally, that "[n]o public utility shall charge, demand, collect or receive a greater or less compensation for any service performed by it * * * than is specified in printed rate schedules as may at the time be in force."

Plaintiffs' third claim was a common-law claim for "money had and received." *Service Lumber Co. v. Sumpter Val. Ry. Co.*, 67 Or 63, 77, 135 P 539 (1913), *judgment set aside on other grounds*, 81 Or 32, 158 P 175 (1916), describes that kind of claim as follows:

"In the action for money had and received, it is sufficient to show that, by any process which was treated by the parties as a money transaction, the defendant has received money, or its equivalent, which in equity and in good conscience belongs to and should be paid to the plaintiff, and this is true although the plaintiff may never have had actual manual custody of the specie in question."

Plaintiffs alleged that PGE charged them and other ratepayers amounts that had been determined to be unlawful and that those amounts in equity and good conscience belonged to and should be paid to plaintiffs.

In their fourth claim for relief, plaintiffs alleged that PGE was "unjustly enriched" by the amounts that it collected, as part of its rates, as a return on its Trojan investment, and that it should not be permitted to retain that money.

PGE moved to dismiss. It argued that plaintiffs' actions trespassed on the PUC's jurisdiction, noting that, in its recent remand of PUC Order No. 02-227, the circuit court had ordered the PUC to provide the very same relief that plaintiffs were seeking. Plaintiffs responded, however, that the PUC was not moving forward on the remanded case and insisted that, in any event, they were entitled to proceed in spite of the remand to the PUC. Plaintiffs pointed, in that regard, to ORS 756.200, which provides:

"(1) The remedies and enforcement procedures provided in ORS chapters 756, 757, 758 and 759 do not release or waive any right of action by the state or by any person for any right, penalty or forfeiture which may arise under any law of this state or under an ordinance of any municipality thereof.

"(2) All penalties and forfeitures accruing under said statutes and ordinances are cumulative and a suit for and recovery of one shall not be a bar to the recovery of any other penalty.

"(3) The duties and liabilities of the public utilities or telecommunications utilities shall be the same as are prescribed by the common law, and the remedies against them the same, except where otherwise provided by the Constitution or statutes of this state, and the provisions of ORS chapters 756, 757, 758 and 759 are cumulative thereto."

The circuit court denied the motion to dismiss but indicated that it might consider abating the actions at some later point. PGE did later move to abate in accordance with that suggestion.

Plaintiffs then moved for partial summary judgment on two of their claims. PGE opposed that motion and filed its own motion for a summary judgment on plaintiffs' claims. The circuit court granted plaintiffs' motion and denied PGE's cross-motion. PGE then filed the first of the two petitions for an alternative writ of mandamus that presently are before this court, asking this court to order the circuit court to dismiss plaintiffs' complaints. Shortly thereafter, the circuit court issued an order certifying plaintiffs' actions as class actions pursuant to ORCP 32. PGE then filed its second petition for an alternative writ, this time asking this court to order the circuit court to vacate its order certifying the cases as class actions.

On April 9, 2005, this court consolidated the cases and issued the requested alternative writs. The circuit court responded, urging the court to dismiss the writs as improvidently granted. With respect to the first petition, the circuit court argued that plaintiffs had instituted their actions pursuant to ORS 756.185 and the common law, and that the statutes (specifically, ORS 756.185 and ORS 756.200(2)) indicate such actions and remedies are preserved, regardless of the availability of agency remedies. With respect to the second petition, the circuit court argued only that certification of a class should be treated as an act of judicial discretion with respect to which the right to appeal is an adequate remedy. Since then, PGE and plaintiffs both have filed briefs on the merits, and a number of *amici* have offered their views.

■ Before we turn to the parties' arguments, we note that the extraordinary remedy of a writ of mandamus is available to compel a court's decision only when the law *requires* a particular decision. *See* ORS 34.110 (writ available to compel an act which the law "specially enjoins"). We further note that such writs ordinarily are not available when there is a "plain, speedy and adequate remedy in the ordinary course of the law." *Id.* Thus, to obtain the specific remedy that it seeks (dismissal), PGE must persuade us that the law requires dismissal of plaintiffs' actions and that the ordinary remedy of reversal on appeal is inadequate.

■ PGE's first argument in that regard is that none of plaintiffs' four claims has any basis in the law—specifically,

that plaintiffs' two statutory claims misconstrue the relevant statutes and that the two "common-law" claims in fact are based in statute and do not exist in the common law. However, as will be seen, we find PGE's arguments with respect to at least one of those claims to be unpersuasive. We refer, in particular, to plaintiffs' first claim, which alleges that PGE violated ORS 757.355 (1993) by charging and receiving rates that include a return on PGE's investment in the defunct Trojan plant. The first claim also alleges that, under ORS 757.185(1), PGE is liable to plaintiffs for damages that they sustained in consequence of that violation.

PGE argues that that first claim involves a misreading of ORS 757.355 (1993) and that, if properly interpreted, it should be clear that PGE did not and could not violate that statute. PGE's argument in that respect begins with the premise that, under the so-called "filed rate doctrine" embodied in ORS 756.225 (see above, 341 Or at 270-71 n 10), PGE's rates during the relevant period were conclusively lawful and were the only rates that PGE was permitted to collect. It follows, PGE argues, that, if ORS 757.355 (1993) is read (as plaintiffs do) as a mandate directed at PGE, then PGE is subject to conflicting mandates and must violate one in order to satisfy the other.[13] PGE contends that that situation is untenable and that the only reasonable resolution is to read ORS 757.355 (1993) as a directive *to the PUC* rather than to utilities. Such a resolution would preclude any claim that PGE had "[done] or cause[d] or permit[ted] to be done any matter, act or thing prohibited by" the statute, as plaintiffs' first claim for relief alleges.

The obvious problem with PGE's argument is that it would rob ORS 757.355 (1993) of any vitality. PGE assures us that that does not mean that ORS 757.355 (1993) is unenforceable, but only that the proper method of enforcement is a suit to set aside an order of the PUC as provided by ORS 756.580 (and not a civil action against PGE itself under ORS

---

[13] Specifically, PGE asserts that if it adheres to ORS 756.355 (1993) and excludes return-on-investment charges from its rates, it would be charging less than the published PUC-approved rates, thereby violating ORS 757.225. If, on the other hand, PGE charges the published rates because ORS 757.225 (as PGE interprets it) requires PGE to do that, it would violate ORS 756.355 (1993), because the published rates include return-on-investment charges.

756.185(1)). Of course, PGE acknowledges, that may mean that ratepayers have no clear mechanism for obtaining a refund of charges that the PUC approves and that the utility collects, but that later are determined to be unlawful. PGE contends, however, that the refund issue is premature because the PUC now is engaged in a proceeding to determine whether a refund is required and, in any event, the mechanism for obtaining a refund that plaintiffs seek to employ here—an action for damages under ORS 756.185(1)—is clearly improper.

Plaintiffs' first objection to the foregoing analysis goes to PGE's perspective on the meaning and effect of ORS 756.225. Plaintiffs deny that that statute embodies the extreme form of the "filed rate doctrine" that PGE (and, apparently, the PUC) advocate. They suggest that, so long as it is appealed, a rate order is not final (and, therefore, cannot serve as a shield against a claim of unlawfulness), at least until the final appellate judgment is entered. In support of that argument, plaintiffs point out that, according to ORS 756.565, a PUC-approved rate is only "prima facie" lawful:

> "All rates, tariffs, [etc.] approved or prescribed by the Public Utility Commission and any order made or entered upon any matter within the jurisdiction of the commission shall be in force and shall be prima facie lawful and reasonable until found otherwise in a proceeding brought for that purpose under ORS 756.580 to 756.610."

Plaintiffs also note that, by its clear terms, ORS 757.355 (1993) is directed at utilities and not at the PUC ("No public utility shall * * *."). They contend, moreover, that there is no need to twist the words of that statute in order to reconcile it with ORS 757.225. They argue that the two statutes are easily reconciled—that ORS 757.225 should be read as requiring utilities to treat published rates as provisionally lawful, but not as absolutely shielding utilities from having to return any part of their rates that later is adjudged to be unlawful.

We share plaintiffs' skepticism of the proposition that is at the heart of PGE's argument—that ORS 757.225 manifests a legislative intent that PUC-approved rates be treated as conclusively lawful for all purposes "until they are

changed as provided in ORS 757.210 to 757.220." We find it significant that, although the public utility statutes provide more than one process for changing the filed rates for a utility, ORS 757.225 refers to only one such process—the utility-initiated process "provided by ORS 757.210 to 757.220." If PGE's interpretation of ORS 757.225 were correct, then *only* rate changes adopted pursuant to the utility-initiated rate-making process at ORS 757.210 to 757.220 would be valid. A necessary corollary of that interpretation would be that rate changes adopted under any alternative process provided in the statutes, including the ratepayer- or PUC-initiated process set out at ORS 756.500 to 756.515, would *not* produce a binding change to the "lawful" rate. Those two propositions do not persuade us.

Based on the foregoing, we therefore agree with plaintiffs that ORS 757.225 is most reasonably read as a direction to utilities to charge all their ratepayers the PUC-approved rate and, if a utility is dissatisfied with a rate, to obtain a new PUC-approved rate through the process set out at ORS 757.210 to 757.220. The statute is not aimed, as PGE suggests, at conclusively and permanently binding the entire world to the rate decisions of the PUC.[14]

It follows that, in the context of the present controversy, there is no necessary conflict between ORS 757.225 (directing utilities to charge the filed rate and to seek a rate change if that filed rate is unsatisfactory) and a natural reading of ORS 757.355 (1993), *i.e.*, as a prohibition directed at utilities.[15] And, because we do not accept PGE's contention that ORS 757.355 (1993) has no application to the conduct of

---

[14] Although we reject PGE's contention here that ORS 757.225 embodies the particular application of the filed-rate doctrine that it espouses, we do not reject the possibility that Oregon utility law incorporates some form of the doctrine. We simply do not address that question here.

[15] We acknowledge that that interpretation could pose a dilemma for utilities, in that they theoretically could find themselves to be statutorily bound to collect a PUC-approved rate that includes amounts that, by statute, are unlawful for them to collect. However, realistically, utilities will rarely if ever be placed involuntarily into such a position; rather, they will make a calculated decision to pursue a theory that may or may not withstand judicial review (as in the present case), with the consequences of such a ruling factored into the choice to press their theory in the first place.

utilities, we cannot accept its derivative contention that plaintiffs' first claim has no basis in the law.

Because PGE has failed to persuade us that plaintiffs' first claim is legally untenable, we need not consider its similar challenges to the other three claims. If even one of plaintiffs' claims is viable, then the law cannot compel the dismissal of the complaints on the theory that none of the claims has any basis in the law.

■    PGE next argues that plaintiffs' complaints must be dismissed because they either are time barred or amount to an unlawful collateral attack on unappealed and final orders of the PUC. PGE begins by noting that plaintiffs' claims pertain to overcharges that PGE purportedly collected between April 1995 and October 2000, after the PUC approved the charges in PUC Order No. 95-322 and before the PUC issued its order implementing the settlement with CUB. PGE then notes that, although CUB and URP timely challenged PUC Order No. 95-322 under ORS 755.580 (and obtained by that challenge a judicial determination that the charges were unlawful), *that* rate order was superseded within eight months by a new rate order, PUC Order No. 95-1216. PGE contends that, because no one sought review within the time period provided in ORS 756.580 of PUC Order No. 95-1216, it became final and no longer can be challenged, either directly through an action under ORS 756.580 or collaterally, as in the present action. Thus, PGE argues, to the extent that plaintiffs' claims pertain to overcharges that occurred after the effective date of PUC Order No. 95-1216, those claims are barred as unlawful collateral attacks on unchallenged orders. As to the overcharges that occurred before the effective date of PUC Order No. 95-1216, PGE contends that any claim based on those charges is barred by the applicable statute of limitations, ORS 12.080, because the charges were collected more than six years before April 17, 2003 (the date when plaintiffs filed their present action).

PGE's argument fails on a number of grounds. First, the argument is premised on the idea that plaintiffs' challenge ultimately and necessarily is directed at the PUC and its rate orders, rather than at PGE and its alleged violation of

ORS 757.355 (1993). As we already have explained, we disagree with that premise. Whether or not they ever succeed, plaintiffs clearly are suing PGE for money that they say PGE owes them. Furthermore, PGE fails to acknowledge that the "unchallenged" rate orders do not address in any manner the rate treatment of Trojan. Those orders retained the rate treatment that previously had been approved (and thereafter was excluded from the decision-making process), at least in part because the two prior orders that had decided the issue were in the courts on appeal.

In that regard, we note that the PUC first decided the question of PGE's entitlement to a return on Trojan in the abstract, in the declaratory ruling designated as PUC Order No. 93-1117. CUB and URP challenged that order as provided in ORS 756.580. Shortly thereafter, the PUC issued PUC Order No. 95-322, the rate order that implemented its decision in PUC Order No. 93-1117. In that order, the PUC expressly refused to revisit its prior conclusion in PUC Order No. 93-1117 that PGE could recover a return on its Trojan investment from ratepayers, and noted that its conclusion was on appeal. CUB and URP sought judicial review of that order as well.[16] Eight months later, PGE sought another adjustment in its rates, but it did not propose to change the rate treatment of its investment in Trojan. URP *did* attempt to raise the "return on Trojan" issue at that time, but the PUC again refused to consider the matter on the ground that it already had been presented and resolved in PUC Order No. 95-322. Thereafter, PGE sought and the PUC granted a number of modifications to PGE's rates, but the rate treatment of PGE's investment in Trojan already had been decided in PUC Order No. 95-322 and was not raised as an issue in those cases. As such, the fact that no one timely challenged either PUC Order No. 95-1216 or any of the rate orders that followed it is irrelevant.

■ PGE argues, finally, that dismissal is required because plaintiffs' claims pertain to matters of utility regulation that are the exclusive province of the PUC (and, thus,

---

[16] As we previously noted, the challenges to PUC Order No. 93-1117 and PUC Order No. 95-322 were combined for purposes of appeal in *Citizens' Utility Board*, 154 Or App 702.

are beyond the jurisdiction of the circuit court). PGE begins that argument with a proposition that is beyond serious dispute—that ratemaking is a quasi-legislative function that is vested in the PUC by statute. But PGE then moves on to a more debatable proposition, namely, that any resolution of the present action necessarily will involve ratemaking. PGE contends that that is so because "the jury will have to decide what rates the PUC would or should have set if it had not made an error in [PUC] Order [No.] 95-322."

We disagree. Although a jury theoretically could go about deciding the damage question in the manner suggested, *i.e.*, by determining what a "fair and reasonable" rate would have been if the objectionable return on Trojan had been excluded and then comparing that rate to the one actually charged during the relevant period, it also could simply attempt to determine what part of the rates that the PUC had approved as "fair and reasonable" in fact represented a return on PGE's investment in Trojan and, therefore, were unlawful under ORS 757.355 (1993), as interpreted in *Citizens' Utility Board*, 154 Or App 702. The first approach arguably would invade the PUC's exclusive ratemaking authority, but we are not persuaded that the latter approach would involve a similar trespass.

PGE also seems to argue, in a more nebulous way, that plaintiffs' actions in circuit court fly in the face of a "comprehensive statutory scheme" that assigns all matters relating to utility regulation to the PUC and limits courts to reviewing PUC orders. We note, however, that plaintiffs rely on provisions within that supposedly "comprehensive statutory scheme," ORS 756.185(1) and ORS 756.200, that appear to contemplate judicial involvement in matters other than review of PUC orders.

Thus, we do not accept PGE's argument that the circuit court is without jurisdiction to hear plaintiffs' claims because they necessarily involve ratemaking or pertain to utility regulation. Neither do we accept any of PGE's other arguments urging that the law *requires* dismissal of plaintiffs' actions. As such, we conclude that the particular remedy

that PGE seeks is not available: We cannot issue a peremptory writ ordering the circuit court to dismiss plaintiffs' actions and vacate its class certification order.

■      We could, at this point, dismiss the writs and leave the parties to their ongoing struggle in the circuit court. However, we believe that doing so would not be appropriate because, even if the circuit court had no duty to dismiss plaintiffs' cases, it appears clear to us that the court had a legal duty to abate the proceedings.

Respecting abatement, we note that the PUC now is engaged in a proceeding that involves (essentially) the same controversy, the same ratepayers, and the same effort at determining a remedy for PGE's collection of unlawful rates, as do the present actions. That being the case, we believe, for the reasons we describe below, that the doctrine of primary jurisdiction requires that the present actions defer to that proceeding.

In *Boise Cascade Corp. v. Board of Forestry*, 325 Or 185, 935 P2d 411 (1997), this court described the doctrine of primary jurisdiction as follows:

> "Judicial invocation of the doctrine of primary jurisdiction generally is appropriate when a court decides that an administrative agency, rather than a court of law, initially should determine the outcome of a dispute or one or more issues within that dispute that fall within that agency's statutory authority. The purpose behind the doctrine is the 'recognition of the need for orderly and sensible coordination of the work of agencies and of courts.' * * * The reason for the doctrine is 'not a belief that an agency's expertise makes it superior to a court, [but] that a court confronted with problems within an agency's areas of specialization should have the advantage of whatever contributions the agency can make to the solutions.' That is, the doctrine is one ordinarily invoked by a court in the traditional judicial system with the belief that a previous agency disposition of one or more issues before the court will assist the court in resolving the case before it.

> "Courts vary in their approaches to invoking the doctrine of primary jurisdiction. According to one treatise on administrative law, with which we agree:

" 'There is no fixed formula for determining whether an agency has primary jurisdiction over a dispute or an issue raised in a dispute. In making such determinations, courts consider several factors, including (1) the extent to which the agency's specialized expertise makes it a preferable forum for resolving the issue, (2) the need for uniform resolution of the issue, and (3) the potential that judicial resolution of the issue will have an adverse impact on the agency's performance of its regulatory responsibilities. * * *'

"Upon invoking the doctrine of primary jurisdiction, the disposition of the case depends on the nature of the parties' dispute and the scope of the agency's authority. If an agency has primary jurisdiction over the entire dispute, the court action is dismissed. However, if an agency has primary jurisdiction over an issue in dispute

" 'the court will defer any decision in the action before it until the agency has addressed the issue that is within its primary jurisdiction.' "

*Id.* at 192-93 (quoting Kenneth Culp Davis, *Administrative Law Text* (3d ed 1972) (citations omitted)).

The initial question, then, is whether there are one or more issues in the present actions as to which the PUC should be deemed to have primary jurisdiction. We note, in that regard, that an essential component of plaintiffs' claim is that they were injured by PGE's collection and retention of rates that were based in part on amounts unlawfully representing PGE's investment in the defunct Trojan facility. We also note that, even before plaintiffs filed their actions, the PUC had received two remands from the courts, at least one of which clearly contemplated that the PUC would fashion a remedy for those very injuries.[17] Finally, we note that the

---

[17] They were (1) the remand in the final appellate judgment in *Citizens' Utility Board*, 154 Or App 702, "for further proceedings consistent with the opinion and orders of the Court of Appeals"; and (2) the remand from the circuit court in *Utility Reform Project*, which instructed the PUC

"to immediately revise and reduce the existing rate structure so as to fully and promptly offset and recover all past improperly calculated and unlawfully collected rates, or alternatively, to order PGE to immediately issue refunds for the full amount of all excessive and unlawful charges collected by the utility for a return on its Trojan investment."

PUC now is engaged in carrying out those remands in a single proceeding.

Although plaintiffs vigorously deny it, the PUC proceeding that is underway thus has the potential for disposing of the central issue in these cases, *viz.*, the issue whether plaintiffs have been injured (and, if they have been, the extent of the injury). In that regard, we note that the PUC has been instructed either to revise and reduce rates to offset the previous "improperly calculated and unlawfully collected rates" or to order PGE to issue refunds. Depending on how the PUC responds to that remand, some or all plaintiffs claimed injuries may cease to exist. Moreover, the PUC's specialized expertise in the field of ratemaking gives it primary, if not sole, jurisdiction over one of the remedies contemplated in the remand: revision of rates to provide for recovery of unlawfully collected amounts. Certainly, if the PUC decides to take that approach to the problem, its special expertise makes it a far superior venue for determining that remedy.

The PUC also has special expertise with respect to an issue that lurks in the background of this case: Whether the PUC can order refunds or any other form of retroactive relief for amounts that PGE collected in violation of ORS 757.355 (1993).[18] At times, plaintiffs appear to suggest in their briefing that that issue is irrelevant, because they can proceed in circuit court in any event. At other times, however, plaintiffs seem to suggest that the PUC's refusal or lack of authority to act justifies their actions in circuit court. We think that the issue of PUC's authority *is* relevant in the present case: If that agency can and does provide a full or partial remedy, then plaintiffs either are not injured at all or, if they remain injured, their remedy is to seek judicial review of the PUC's order. In the former case, the circuit court can dismiss the actions. In the latter case, the scope of the court's work will be usefully curtailed. In either event, the issue of the PUC's authority to provide a retroactive remedy is one that, at least initially, belongs before that body.

---

[18] This is an issue that potentially affects some of the plaintiffs—those who were PGE customers during the pertinent time period but no longer are customers—differently than it affects those who were customers during the pertinent time period and remain so. We note the potential dichotomy only to demonstrate that PUC's ultimate choice of remedy can have many possible effects.

Turning to the other two primary jurisdiction factors set out above, we think that this clearly is a case in which a uniform resolution of the issue is desirable. Conflicting or inconsistent resolutions of the remedy issue between the PUC and the circuit court would be highly problematic for the resolution of this dispute and for utility regulation generally.

Finally, we are persuaded that, in the present context, judicial resolution of the remedies issue before the PUC has acted would interfere with that agency's performance of its regulatory functions. In two judicial review actions that preceded the present action, courts have issued remands to the PUC that explicitly or implicitly contemplate some decision about PGE ratepayers' entitlement to a remedy. The PUC is performing part of its regulatory functions when it responds to those remands. A contemporaneous circuit court proceeding directed at the same issue would not, in our view, move that process forward.[19]

We conclude, in short, that the PUC has primary jurisdiction to determine what, if any, remedy it can offer to PGE ratepayers, through rate reductions or refunds, for the amounts that PGE collected in violation of ORS 757.355 (1993) between April 1995 and October 2000. If the PUC determines that it can provide a remedy to ratepayers, then the present actions may become moot in whole or in part. If, on the other hand, the PUC determines that it cannot provide a remedy, and that decision becomes final, then the court system may have a role to play. Certainly, after the PUC has made its ruling, plaintiffs will retain the right to return to the circuit court for disposition of whatever issues remain unresolved, including the question of a fee award. That is the way that abatement is supposed to work. Until the PUC has had the opportunity to do its work, parallel circuit court litigation

---

[19] We acknowledge that plaintiffs are concerned that, in spite of the circuit court's remand, PUC will refuse to provide any remedy for the amounts that PGE unlawfully collected between April 1995 and October 2000 on the ground that it has no authority to make retroactive adjustments to rates. Plaintiffs may be correct, but we cannot sit in review of speculation about what an agency will decide. Moreover, the issue that plaintiffs raise—whether the PUC has authority to order refunds or other retroactive relief—will not be ripe for decision by an appellate court until the PUC acts.

is duplicative and unnecessary. It should be abated. Accordingly, we issue a peremptory writ ordering the circuit court to abate the present actions.

Peremptory writ to issue.