Argued and submitted September 11, 2012, affirmed February 26, 2014

UTILITY REFORM PROJECT
and Ken Lewis,
*Petitioners,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON
and Portland General Electric Company,
*Respondents.*

Public Utility Commission of Oregon
UM1224; A143640

323 P3d 430

Daniel W. Meek argued the cause and filed the briefs for petitioners.

Erin C. Lagesen, Assistant Attorney General, argued the cause for respondent Public Utility Commission of Oregon. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

James N. Westwood argued the cause for respondent Portland General Electric Company. With him on the brief were Brad S. Daniels and Stoel Rives LLP.

Before Wollheim, Presiding Judge, and Nakamoto, Judge, and Schuman, Senior Judge.

WOLLHEIM, P. J.

### WOLLHEIM, P. J.

Pursuant to ORS 756.610(1), petitioners Utility Reform Project and Ken Lewis (collectively referred to as URP) seek judicial review of an order of the Public Utility Commission (PUC) denying URP's request under ORS 757.259 to direct respondent Portland General Electric (PGE) to amortize certain deferred amounts into future rates. URP asserts that legislation passed in 2005 required the PUC to order PGE to refund amounts over-collected from ratepayers for taxes from October 5, 2005 to December 31, 2005, and that, in denying its request for amortization of the excess taxes collected, the PUC acted outside the range of its discretion and in violation of the law. We review the PUC's order pursuant to ORS 183.482(8); ORS 756.610(1), and affirm.

This case involves the utility rate treatment of federal and state taxes by PGE and the PUC for the period October 5, 2005 through December 31, 2005, in light of Senate Bill (SB) 408 (2005), enacted as Oregon Laws 2005, chapter 845, sections 2 to 5. In *Industrial Customers of Northwest Utilities v. PUC*, 240 Or App 147, 246 P3d 1151 (2010), we summarized that legislation. As we explained, a public utility is allowed to build into its rates the amount that the utility expects to pay in income taxes. *Id.* at 150. Before the enactment of SB 408, the PUC permitted a utility to charge ratepayers for "taxes that assume the utility is not part of an affiliated group of corporations for tax purposes." *Former* ORS 757.267(1)(c). As a practical matter, however, utilities were filing their taxes as part of an affiliated group, whereby losses from within the affiliated group had the potential to reduce or eliminate the utility's tax liability.[1] Before the enactment of SB 408, there was no mechanism to verify whether the utility's projected taxes were actually paid. 240 Or App at 150-51. SB 408 was designed to provide that mechanism.

---

[1] The legislation originated from a discovery that PGE, then owned by the Enron Corporation, reported tax liabilities (which the PUC allowed PGE to include in its rates charged to PGE customers) that, because of conglomerate accounting practices, were not actually paid to units of government.

Section 2 of SB 408, enacted as *former* ORS 757.267,[2] consisted of a series of legislative findings and statements concerning the "alignment of taxes collected by public utilities from utility customers with taxes paid to units of government by utilities, or affiliated groups that include utilities." Among the statements, *former* ORS 757.267(f) provided that

"[u]tility rates that include amounts for taxes should reflect the taxes that are paid to units of government to be considered fair, just and reasonable."

Section 5 of SB 408 amended ORS 757.210(1), relating to hearings to establish new rates or rate schedules. Formerly, ORS 757.210(1) provided that the PUC shall "conduct a hearing to determine the propriety and reasonableness of such rate or schedule." Effective on the bill's passage, the statute provides that the PUC shall conduct a hearing to determine "whether the rate or schedule is fair, just and reasonable." Or Laws 2005, ch 845, § 5. The amendment also added to ORS 757.210(1) the statement that "[t]he commission may not authorize a rate or schedule of rates that is not

---

[2] *Former* ORS 757.267 provided:

"(1) The Legislative Assembly finds and declares that:

"(a) The alignment of taxes collected by public utilities from utility customers with taxes paid to units of government by utilities, or affiliated groups that include utilities, is of special interest to this state.

"(b) Taxes are a unique utility cost because the tax liability is affected by the operations or tax attributes of the parent company or other affiliates of the utility.

"(c) The Public Utility Commission permits a utility to include costs for taxes that assume the utility is not part of an affiliated group of corporations for tax purposes.

"(d) The parent company of a utility may employ accounting methods, debt, consolidated tax return rules and other techniques in a way that results in a different between the tax liability paid to units of government by the utility, or the affiliated group or corporations of which the utility is a member, and the amount of taxes collected, directly or indirectly, from customers.

"(e) Tax uncertainty in the ratemaking process may result in collecting taxes from ratepayers that are not paid to units of government.

"(f) Utility rates that include amounts for taxes should reflect the taxes that are paid to units of government to be considered fair, just and reasonable.

"(g) Tax information of a business is commercially sensitive. Public disclosure of tax information could provide a commercial advantage to other businesses.

"(2) The definitions in ORS 757.268 apply to this section."

fair, just and reasonable." *Id.* Section 3 of SB 408, enacted as *former* ORS 757.268(1),[3] required a public utility to file an annual tax report, from which the PUC could determine the difference between the taxes projected to be paid and the taxes ultimately paid by the utility or the utility's affiliated corporate group. As an exception to the well-settled rule requiring that utility rates be set prospectively (the rule against retroactive ratemaking), *see Gearhart v. PUC,* 255 Or App 58, 100, 299 P3d 533, *rev allowed,* 354 Or 386 (2013), if the PUC determined that the difference between the amount charged to ratepayers for tax expense and the amount actually paid was $100,000 or more, the legislation required the utility to establish an automatic adjustment clause in its rate schedule that would allow for the adjustment of rates to account for the discrepancy. *Former* ORS 757.268(4); *Industrial Customers of Northwest Utilities,* 240 Or App at 149.

Although SB 408 itself was effective on its passage date of September 2, 2005, Or Laws 2005, ch 845, § 6, the automatic adjustment provision applied only to taxes paid to units of government and collected from ratepayers on or after January 1, 2006. Or Laws 2005, ch 845, § 4(2). Thus, the automatic adjustment provision did not assist URP in its quest to recover taxes collected from ratepayers by PGE but not paid to a government entity during the period of October 5, 2005 through December 31, 2005.

Under ORS 757.259, in exceptional circumstances, the PUC has authority to permit the retroactive adjustment of rates through "deferral" of costs or revenues for later incorporation in rates:

"(1) In addition to the powers otherwise vested in the Public Utility Commission, and subject to the limitations contained in this section, under amortization schedules set by the commission, a rate or rate schedule:

"(a) May reflect:

"* * * * *

"(B) Amounts deferred under subsection (2) of this section.

---

[3] In 2011, the legislature repealed ORS 757.267 and ORS 757.268. Or Laws 2011, ch 137, § 5.

"* * * * *

"(2) Upon application of a utility or ratepayer * * * and after public notice, opportunity for comment and a hearing * * * the commission by order may authorize deferral of the following amounts for later incorporation in the rates:

"* * * * *

"(e) Identifiable utility expenses or revenues, the recovery or refund of which the commission finds should be deferred in order to minimize the frequency of rate changes or the fluctuation of rate levels or to match appropriately the costs borne by and benefits received by ratepayers."

Under the limited circumstances listed in ORS 757.259, the PUC may exercise its discretion to defer expenses or revenues to a subsequent rate or rate schedule.[4] "Amortization" is the process by which a deferred expense or revenue becomes incorporated into a subsequent rate or rate schedule. ORS 757.259(5) provides that, unless subject to an automatic adjustment clause, the deferral and amortization of amounts described in subsection (2)

"shall be allowed in rates only to the extent authorized by the commission in a proceeding under ORS 757.210 to change rates and upon review of the utility's earnings at the time of application to amortize the deferral. The commission may require that amortization of deferred amounts be subject to refund."

In the exercise of its discretion to defer and amortize an expense or revenue, the PUC must hold a hearing under ORS 757.210, relating to hearings to establish new rates or rate schedules. Because the automatic adjustment clause provision of SB 408 was not applicable to the period for which URP sought relief, URP sought relief under ORS 757.259, by requesting a deferral of amounts collected from ratepayers from October 5, 2005 through December 31, 2005, for taxes during that period that were not paid to units of government. URP sought the deferral so that the amounts could then be refunded through amortization in future rates.[5]

---

[4] See Appendix for the text of OAR 860-027-0300, the administrative rule relating to the deferred accounting process.

[5] URP also filed a complaint against PGE pursuant to ORS 757.500, alleging that PGE's rates after September 2, 2005, violate SB 408. The PUC dismissed the complaint, and URP does not challenge that ruling.

Although the PUC determined that URP's deferral application was "procedurally insufficient," for the sake of administrative efficiency, the PUC decided to construe URP's application liberally to assert a request for deferral. After considering the legislature's policy statement in *former* ORS 757.267(1)(f), as well as the statement in ORS 757.210 that "[t]he commission may not authorize a rate or schedule of rates that is not fair, just and reasonable," the PUC was persuaded that setting up a deferral account was an appropriate mechanism for treatment of taxes to be collected from ratepayers but unpaid by PGE during the "pre-adjustment clause period"—after the passage of SB 408 but before implementation of the statute's automatic adjustment clause provision. Concluding that the impact of the passage of SB 408 was "sufficient to warrant an exercise" of discretion and that the requested deferral "will appropriately match ratepayer costs and benefits pursuant to ORS 757.259(2)(e)," in Order No. 07-351, the PUC exercised its discretion under ORS 757.259 to order that PGE give deferred accounting treatment to revenue of $26.5 million, with interest, attributable to PGE's liabilities for federal and state income tax for which ratepayers were to be charged for the period beginning October 5, 2005 (the date petitioners filed their application for deferral) and ending December 31, 2005, but that PGE had not paid, as calculated using the methodology of SB 408. The PUC noted that the impact of the deferral on PGE's earnings "will be reviewed at the time we consider amortization of the deferral. ORS 757.259(5)." The PUC directed PGE to file an "earnings test" by December 1, 2007.

Indeed, the PUC did subsequently consider the impact of the deferral on PGE's earnings. On January 11, 2008, URP requested that the PUC order PGE to amortize the amount in the deferred account, as authorized by ORS 757.259(5). In a further proceeding, which the PUC characterized as the "amortization phase," the PUC considered whether the deferred amount should be amortized and "what rate change, if any, was appropriate as a result of the deferral," "concurrent with changes in rates that would result, on June 1, 2008, from the automatic adjustment clause under SB 408." Based on the earnings test it filed for the period of October 5, 2005 through December 31, 2005, PGE took the position that the deferred account should not be amortized.

The PUC agreed with PGE, concluding that a review of PGE's earnings during the deferral period of October 5, 2005 through December 31, 2005, showed that PGE's return on equity was significantly lower than authorized by the PUC, that an amortization of the deferred amount would result in a return on equity below a reasonable range, and that PGE needed to retain the deferred revenues in order for PGE's return to not fall further outside the range of reasonableness. The PUC therefore denied URP's request to amortize the deferral amount. The PUC's Order No. 09-316, denying URP's request to amortize the deferred amount, is the subject of this judicial review.

In a single assignment of error, URP asserts for multiple reasons that the PUC erred in declining to return to ratepayers the deferred amount via amortization in subsequent rates. As best we can determine, URP's arguments distill down to four main assertions, and we consider most of them in turn:

*(1) In determining whether to amortize the deferred amount, the PUC erred in considering PGE's earnings, because there is no statutory basis for consideration of a utility's earnings, and doing so results in a violation of the rule against retroactive rulemaking.* URP's contention boils down to this: Although the PUC agreed with URP that during the last three months of 2005 PGE had charged ratepayers $26.5 million for income taxes not actually paid, the PUC allowed PGE to keep that money, using the excuse that during the period October 2005 to September 2006, PGE did not earn its authorized level of profits. URP contends that PGE's earnings during that time are irrelevant to the unlawfulness of the rates charged during that same period and cannot relieve PGE of the obligation to return the unlawfully charged amounts to ratepayers with interest. URP contends that the PUC's order violates the rule against retroactive rulemaking (which prohibits applying past profits or losses in determining future rates unless the legislature authorizes otherwise) because it allows PGE to offset the deferred amount unlawfully collected against past losses (or under-earnings) that have not been and could never be deferred.

We readily reject URP's argument. Contrary to URP's contention, ORS 757.259(5) expressly provides for consideration of a utility's earnings in making the determination whether to amortize the amount deferred. That subsection states that,

"[u]nless subject to an automatic adjustment clause * * * [deferred amounts] shall be allowed in rates only to the extent authorized by the commission in a proceeding under ORS 757.210 to change rates *and upon review of the utility's earnings at the time of application to amortize the deferral. The commission may require the amortization of deferred amounts be subject to refund.*"

(Emphasis added.) That subsection *required* the PUC to consider PGE's earnings in determining whether to amortize the deferred amount. In considering PGE's earnings, the PUC is to take them into account in determining, in its discretion, if the deferred account should be amortized into future rates. If, as URP contends, the effect of that provision is to authorize retroactive ratemaking, then it should be viewed as an exception that the legislature itself has mandated.

*(2) If PGE's earnings are lawfully to be considered, then the PUC considered the incorrect earnings period.* This contention is more nuanced and presents a question of statutory construction. As noted, ORS 757.259(5) provides that the PUC may allow deferred amounts in rates only "upon review of the utility's earnings at the time of application to amortize the deferral." OAR 860-027-0300(9) provides in turn that upon request for amortization of a deferred amount, a utility must provide the PUC with

"its financial results for a 12-month period or for multiple 12-month periods to allow the Commission to perform an earnings review. The period selected for the earnings review will encompass all or part of the period during which the deferral took place or must be reasonably representative of the deferral period."

If, as the PUC held, PGE's earnings are to be considered, URP questions the PUC's decision to consider URP's earnings during a 12-month period beginning October 1, 2005, and ending September 30, 2006, rather than its earnings

beginning at the time of the request for amortization and during the most recent period for which earnings data is available. In URP's view, the text and context of ORS 757.259 show that the legislature's concern in requiring the PUC to examine the utility's earnings was the impact of amortizing the deferral on rates of the utility at the time of the amortization, and not on whether the utility was sufficiently profitable during the period when the deferred amount was originally accruing. To the extent that OAR 860-027-0300(9) requires consideration of a different period by requiring review of earnings during the deferral period but not necessarily the time of the request for amortization, URP contends, the administrative rule is inconsistent with the statute.

URP's interpretation that the "earnings review" applied by the PUC must include the time of amortization is certainly a plausible one under the statute's text. As URP notes, under the principle of the "last antecedent," where no contrary intention appears, referential and qualifying words and phrases refer solely to the last antecedent, *i.e.*, the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence. *See State v. Webb*, 324 Or 380, 386, 927 P2d 79 (1996) (describing principle). In applying the rule of the last antecedent, it is plausible that the qualifying phrase "at the time of application to amortize the deferral" as used in ORS 757.259(5) modifies the immediately prior noun phrase "utility's earnings," rather than the entire antecedent phrase "upon review of the utility's earnings."

The PUC and PGE respond that, although ORS 757.259(5) is "open to interpretation," the correct interpretation, when the text is viewed in its context and in light of ratemaking principles, is that, although *the review* of the utility's earnings is to take place at the time of the request for amortization, the earnings to be reviewed are not mandated for any particular time period and are those that the PUC determines in its discretion are relevant to the particular deferral and amortization. In this case, the PUC and PGE assert, the PUC concluded within its discretion that the particular relevant time period is the 12 months

beginning October 5, 2005, when PGE's revenues from over-charges from taxes were assigned to a deferred account.

The PUC makes a textual argument that it contends supports its view that the qualifying phrase "at the time of application to amortize the deferral" modifies the entire antecedent phrase "review of the utility's earnings." The PUC explains that a review of earnings necessarily encompasses a review of an interval of time, rather than a moment in time. In contrast, the phrase "at the time" appears to describe a moment in time, which would not be apropos of a review of earnings. PGE joins in the PUC's textual analysis, but adds one of its own, viewing the word "review" as the operative noun modified by two prepositional phrases, "of the utility's earnings," and "at the time of application to amortize the deferral." The first prepositional phrase answers "what is being reviewed"—PGE's earnings. The second prepositional phrase answers "when the review occurs"—at the time of the application.

Additionally, the PUC argues, other subsections of ORS 757.259 show that when the legislature wants to identify an interval of time, it unambiguously does so. *See e.g.,* ORS 757.259(6) (identifying interval of time to be used in calculating maximum annual rate impact of an amortization). Thus, the PUC reasons, the legislature's requirement that an earnings review occur *"at* the time of application to amortize the deferral" shows that the legislature intended to refer to the time when the evaluation takes place—at the time of the request for amortization—and not the period of earnings subject to evaluation.

The PUC makes a number of contextual arguments as well in support of its view that the PUC possesses the flexibility to determine the period of the earnings review and that the legislature did not intend to bind the agency to a review of the utility's earnings at the particular moment in time when the request for amortization is made. For example, ORS 757.259(8) provides that, for an electric utility, the PUC may authorize amortizations "not to exceed six percent of the electric utility's gross revenues for the preceding calendar year." But if the authorized amortization is greater than three percent, with an overall average rate impact

not to exceed six percent of the utility's gross revenues for the preceding calendar year, the PUC "shall estimate" the electric utility's "cost of capital for the deferral period" and "costs and revenues during the deferral period." The PUC asserts that if the review of the utility's earnings for purposes of ORS 757.259(8) is to include consideration of costs of capital and costs and revenues during the deferral period, it only makes sense that the legislature contemplated that the earnings review conducted under ORS 757.259(5) would also encompass earnings during the deferral period. PGE makes the further contextual argument that the PUC promulgated OAR 860-027-0300 shortly after the enactment of ORS 757.259(5) and, although ORS 757.259 has been amended several times in subsequent legislative sessions, the legislature has never repudiated the PUC's interpretation of ORS 757.259(5), as expressed in OAR 860-027-0300.

URP for its part, contends that ORS 757.259(8) suggests just the opposite: By specifically mentioning that an earnings review required under the circumstances of ORS 757.259(8) must include review of costs and revenues during the deferral period, the legislature necessarily intended that a review under ORS 757.259(5) would not include consideration of those costs and revenues.

At this point, it is helpful to consider in somewhat greater detail the PUC's reasoning in its order denying URP's request to amortize the deferred amounts. The PUC was not satisfied that the textual and contextual clues, or the legislative history and maxims of construction, resolved the question of what period was to be included in the earnings review. The PUC pointed to legislative history and other sources suggesting that, when the legislature enacted ORS 757.259(5), it did not have in mind or contemplate a factual scenario like this case, where there was a delay of almost two years between the period for which the deferral was authorized and the requested amortization. The PUC reasoned that it is likely that the legislature envisioned that the reviewed earnings would be contemporaneous with both the deferral period and the request for amortization, because those events would be almost simultaneous. Faced with the conflicting views of its own staff, URP, and PGE, the PUC stated the question thusly:

"When there is a significant gap between the period of deferral and a utility's request for amortization, should the earnings that are reviewed, for the purpose of determining whether it is appropriate to reset rates to account for an unforeseen past event, be contemporaneous earnings *or* earnings contemporaneous with the deferral period?"

In resolving the question, the PUC broadened its inquiry, and asked what interpretation would be most consonant with the principles of utility ratemaking, especially the principles that rates must be reasonable and that a utility's earnings must be within a reasonable range. The PUC discussed the fundamental ratemaking goal of setting *future* rates, which provides the utility with the opportunity to collect revenue sufficient to recover reasonable operating expenses, and to earn a reasonable return on investments made to provide service. Necessarily, future rates must be based on the utility's best estimates of its future expenses and revenues, and the utility must operate with rates in effect until future rates are approved in the next rate case. Because of the rule against retroactive ratemaking, as a general matter, adjustments to rates can compensate the utility on a going-forward basis only. The general rate case does not provide a utility with an opportunity to recoup expenses beyond those forecast in prior rates; nor is the utility expected to remit revenues higher than those previously forecast.

The PUC explained that, in contrast, the deferred accounting process set forth in ORS 757.259, is a mechanism intended to deal with unanticipated expenses and revenues for future recovery in rates. It allows rates to be tracked in a balancing account and adjusted outside of the general rate case when certain expenses or revenues arise that are deemed to be exceptional. The PUC explained:

"Amortization permits the utility to recover or return an amount in a deferred account in future rates, over some period of time. ORS 757.259 directs us to review a utility's earnings before we authorize the amortization of a deferred account, but the current statute does not elaborate with regard to the purpose of or the process for the review.

"We find, however, that the general principles of ratemaking guide us. If a utility has the responsibility, under

general ratemaking, to operate within a fixed level of rates despite actual costs or revenues while striving to earn a certain level of return, then it seems appropriate to determine, under deferred accounting, whether the utility actually operated within its fixed rates despite the deferral of certain funds. If a utility operated within its fixed rates, then the need to amortize the deferred funds is obviated. Reviewing the earnings of a utility during the deferral period provides the Commission with an opportunity to confirm whether costs or revenues that were deferred were truly exceptional, or whether they were absorbed by the utility.

"Based on this reasoning, we conclude that ORS 757.259[(5)] directs us to review a utility's earnings for an interval that includes the deferral period. Reviewing earnings that are entirely distinct from the deferral period would be inconsistent with general principles of ratemaking and deferred accounting. It is appropriate to review a utility's recent earnings when forecasting rates for the future. In contrast, in the extraordinary situation of deferred accounting, it is appropriate to review the utility's earnings during the deferral period in order to determine whether retroactive ratemaking is appropriate to address the exceptional revenues or expenses that were deferred. If past ratepayers paid an appropriate amount of rates for services received, it is inappropriate to burden or enrich future ratepayers based on retroactive events."

As we understand the PUC's reasoning, amortization is an exception to the rule against retroactive ratemaking, because it allows an adjustment to future rates based on past earnings or expenses; for that reason, it is permitted only in exceptional circumstances. A review of a utility's earnings allows the PUC to inquire whether the extraordinary measure of amortization of the deferred amount is justified, *i.e.*, despite the deferred costs or revenues, did the utility earn a reasonable return on its equity during the period of the deferral and did ratepayers pay an appropriate rate for services received? If, despite the deferred costs or revenues, the utility earned a reasonable return of its equity and ratepayers paid a reasonable rate for services, then, according to the PUC's reasoning, the deferred amounts were not exceptional and should not be amortized. Necessarily, that means that the period of the deferral must be a part of the earnings

review, because that is the only way to determine whether the deferred amounts were indeed exceptional. OAR 860-027-0300(9) is consistent with that reasoning to the extent that it requires that "[t]he period selected for the earnings review will encompass all or part of the period during which the deferral took place or must be reasonably representative of the deferral period." Applying that reasoning, the PUC explained that a review of PGE's earnings during a period that included the deferral period, beginning October 1, 2005 through September 30, 2006, showed a return of equity outside any reasonable range. For that reason, the PUC explained, PGE needed to retain deferred revenues in order not to fall further outside the zone of reasonableness.

We are persuaded by the PUC's reasoning. As a textual matter, under the principle of the last antecedent, it makes sense that the qualifier "at the time of application to amortize the deferral," applies to the entire antecedent phrase "upon review of earnings," and not just to "earnings." Viewing the text as described by PGE, as a noun ("review") modified by two prepositional phrases, supports the same conclusion. There is no persuasive grammatical reason to apply the qualifying phrase only to "earnings." Further, as the PUC reasoned, the legislature's choice of the word "at" shows that the legislature contemplated that the qualifying phrase describes the time at which the earnings review takes place—at the time of the application—and not the interval of time to be reviewed. In any event, the statute certainly does not constrain the PUC's discretion to select the exact period or duration for a review of the utility's earnings. The other rationale put forth by the PUC concerning the function of the earnings review in light of the principles of ratemaking also leads us to conclude that the PUC's textual interpretation is the one most likely intended by the legislature. We therefore conclude that the PUC did not err in beginning the earnings review with the beginning of the deferral period.

URP's final contention on this point is that the PUC's current interpretation is inconsistent with the PUC's prior interpretations of the rule, which have included the amortization period in the earnings review, and that the

PUC has not explained the inconsistency. Contrary to URP's contention, however, the PUC did recognize that its interpretation had changed and it did provide an explanation for that change as well as for its conclusion to apply an earnings test to the 12 months beginning with the date of the requested deferral that does not encompass the moment when URP requested amortization of the deferral account.

*(3) The deferral period encompasses the entire period until the unauthorized payment is refunded to ratepayers.* As previously noted, under OAR 860-027-0300(9), upon request for amortization of a deferred amount, a utility must provide the PUC with

> "its financial results for a 12-month period or for multiple 12-month periods to allow the Commission to perform an earnings review. The period selected for the earnings review will encompass all or part of the period during which the deferral took place or must be reasonably representative of the deferral period."

The PUC treated the period from October 5, 2005 through December 31, 2005—the period for which a deferred accounting was authorized—as the deferral period. In URP's view, the deferral period described in the administrative rule is not limited to the period of the deferred accounting, but encompasses

> "the period during which the recognition of those amounts in rates is deferred. That period starts with the application for deferral (if granted) and ends either (1) with the start of the amortization period or (2) with the end of the amortization period."

Thus, URP argues, although the deferral commenced on October 5, 2005, it continues to the present day, because it has not been terminated and the money has not been refunded to ratepayers; accordingly, looking only at data from 2005 and 2006 is not representative of the deferral period. URP further contends that, to the extent that the administrative rule permits the deferral period not to include the time of amortization, it is inconsistent with ORS 757.259.

In view of our rejection of URP's interpretation of ORS 757.259, we also reject URP's contention that an

interpretation of the administrative rule to permit the PUC to select a deferral period that does not encompass the amortization period is inconsistent with the statute. We further conclude that the PUC's interpretation of "deferral period," as used in its own administrative rule, to refer to the period during which the deferred accounting was authorized, is consistent with the statute and also constitutes a plausible reading of the administrative rule's text. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (agency entitled to deference on plausible interpretation of its own rule).

*(4) The PUC's order declining to amortize the deferred account into future rates violates SB 408, which created a new category of "legally unacceptable rates," i.e., rates that include an amount for income taxes other than "taxes that are paid to units of government."* As the capstone of its argument, URP contends that SB 408 acts as an absolute prohibition on rates that include revenues for unpaid taxes, and any rate that includes revenues for unpaid taxes is therefore unlawful. Accordingly, URP contends, by disallowing an amortization of the amounts deferred, the PUC has allowed an unlawful rate for the period October 5, 2005 through December 31, 2005, in violation of law.

The PUC responds that the PUC's decision whether to amortize revenues that were deferred under ORS 757.259(2)(e) is a discretionary decision, reviewed by this court to determine whether it is "outside the range of discretion delegated to the agency by law," ORS 183.482(8), and that the agency did not act outside its discretion.

As we have noted, SB 408 provided a mechanism for an adjustment of revenues for taxes collected but unpaid beginning January 1, 2006. However, contrary to URP's contention, there is no statutory provision requiring the PUC to order utilities to refund amounts collected prior to January 1, 2006. Additionally, although, pursuant to ORS 757.259, the PUC had authority to require PGE to create a deferred account for the revenues collected from ratepayers for unpaid taxes between October 5, 2005 and December 31, 2005, the PUC's authority to require an amortization of the deferred amounts is discretionary. ("In addition to powers

otherwise vested in the Public Utility Commission * * * under amortization schedules set by the commission, a rate or rate schedule * * * [*m*]*ay* reflect * * * [a]mounts deferred." ORS 757.259 (emphasis added).) We conclude for those reasons that the PUC did not act unlawfully when it decided not to require PGE to amortize the deferred amount. We further conclude that the PUC did not abuse its discretion in concluding that it would not order an amortization of the deferred amount.[6]

We reject URP's additional arguments without discussion.

Affirmed.

---

[6] We reject URP's contention that a PUC order in a different case involving a different utility to refund of over-collected taxes in setting prospective rates after the effective date of SB 408 had a preclusive effect or in any way bound the PUC to reach the same conclusion in this case.

## APPENDIX

OAR 860-027-0300 is the PUC's rule relating to the use of deferred accounting by energy utilities and provides:

"(1) As used in this rule:

"(a) 'Amortization' means the inclusion in rates of an amount which has been deferred under ORS 757.259 or 759.200 and which is designed to eliminate, over time, the balance in an authorized deferred account. Amortization does not include the normal positive and negative fluctuations in a balancing account;

"(b) 'Deferred Accounting' means recording the following in a balance sheet account, with Commission authorization for later reflection in rates:

"(A) Electric companies, gas utilities, and steam heat utilities: a current expense or revenue associated with current service, as allowed by ORS 757.259; or

"(B) Large telecommunications utilities: an amount allowed by ORS 759.200.

"(2) Expiration: Any authorization to use a deferred account shall expire 12 months from the date the deferral is authorized to begin. If a deferral under ORS 757.259 or 759.200 is reauthorized, the reauthorization shall expire 12 months from the date the reauthorization becomes effective.

"(3) Contents of Application: Application for deferred accounting, by an energy or large telecommunications utility or a customer, shall include:

"(a) A description of the utility expense or revenue for which deferred accounting is requested;

"(b) The reason(s) deferred accounting is being requested and a reference to the section(s) of ORS 757.259 or 759.200 under which deferral may be authorized;

"(c) The account proposed for recording of the amounts to be deferred and the account which would be used for recording the amounts in the absence of approval of deferred accounting;

"(d) An estimate of the amounts to be recorded in the deferred account for the 12-month period subsequent to the application; and

"(e)  A copy of the notice of application for deferred accounting and list of persons served with the notice.

"(4)  Reauthorization: Application for reauthorization to use a deferred account shall be made not more than 60 days prior to the expiration of the previous authorization for the deferral. Application for reauthorization shall include the requirements set forth in subsections (3)(a) through (3)(e) of this rule and, in addition, the following information:

"(a)  A description and explanation of the entries in the deferred account to the date of the application for reauthorization; and

"(b)  The reason(s) for continuation of deferred accounting.

"(5)  Exceptions: Authorization under ORS 757.259 or 759.200 to use a deferred account is necessary only to add amounts to an account, not to retain an existing account balance and not to amortize amounts which have been entered in an account under an authorization by the Commission. Interest, once authorized to accrue on unamortized balances in an account, may be added to the account without further authorization by the Commission, even though authorization to add other amounts to an account has expired.

"(6)  Notice of Application: The applicant shall serve a notice of application upon all persons who were parties in the energy or large telecommunications utility's last general rate case. If the applicant is other than an energy or large telecommunications utility, the applicant shall serve a copy of the application upon the affected utility. A notice of application shall include:

"(a)  A statement that the applicant has applied to the Commission for authorization to use deferred accounting; or for an order requiring that deferred accounting be used by an energy or large telecommunications utility;

"(b)  A description of the utility expense or revenue for which deferred accounting is requested;

"(c)  The manner in which an interested person can obtain a copy of the application;

"(d)  A statement that any person may submit to the Commission written comment on the application by the date set forth in the notice, which date may be no sooner than 25 days from the date of the application; and

"(e)   A statement that the granting of the application will not authorize a change in rates, but will permit the Commission to consider allowing such deferred amounts in rates in a subsequent proceeding.

"(7)   Public Meetings: Unless otherwise ordered by the Commission, applications for use of deferred accounting will be considered at the Commission's public meetings.

"(8)   Reply Comments: Within ten days of the due date for comments on the application from interested persons, the applicant, and the energy or large telecommunications utility if the utility is not the applicant, may file reply comments with the Commission, and shall serve those comments on persons who have filed the initial comments on the application.

"(9)   Amortization: Amortization in rates of a deferred amount shall only be allowed in a proceeding, whether initiated by the energy or large telecommunications utility or another party. The Commission may authorize amortization of such amounts only for utility expenses or revenues for which the Commission previously has authorized deferred accounting. Upon request for amortization of a deferred account, the energy or large telecommunications utility shall provide the Commission with its financial results for a 12-month period or for multiple 12-month periods to allow the Commission to perform an earnings review. The period selected for the earnings review will encompass all or part of the period during which the deferral took place or must be reasonably representative of the deferral period. Unless authorized by the Commission to do otherwise:

"(a)   An energy utility shall request that amortizations of deferred accounts commence no later than one year from the date that deferrals cease for that particular account; and

"(b)   In the case of ongoing balancing accounts, the energy utility shall request amortization at least annually, unless amortization of the balancing account is then in effect; or

"(c)   A large telecommunications utility shall request amortization of deferred accounts as soon as practical after the deferrals cease but no later than in its next rate proceeding.

"(10)  An electric company customer may prepay under ORS 757.259(11) all or a portion of its obligation of deferred power supply expense. The obligation must be calculated as the customer's pro rata share of the utility's total energy usage within the state of Oregon during 2001, multiplied by the unrecovered deferral balance at the time of prepayment. When such customer has prepaid its obligation in full, the customer may no longer be charged the power supply adjustment related to the deferral."