Argued and submitted October 3, 1997, judgments in CA A86940 and CA A86973 reversed and remanded with instructions; judgments in CA A92935 and CA A93400 affirmed on appeals and cross-appeals June 24, 1998

CITIZENS' UTILITY BOARD OF OREGON,
an independent nonprofit public corporation,
*Appellant,*

PUBLIC POWER COUNCIL,
*Intervenor - Appellant,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON,
*Respondent,*

PORTLAND GENERAL ELECTRIC COMPANY,
*Intervenor - Respondent.*

(94C-10372; CA A86940 (Control))
(Cases Consolidated)

UTILITY REFORM PROJECT,
Colleen O'Neill and Lloyd K. Marbet,
*Appellants,*

*v.*

OREGON PUBLIC UTILITY COMMISSION,
*Respondent,*

PORTLAND GENERAL ELECTRIC CO.,
*Intervenor - Respondent.*

(94C-10417; CA A86973)

CITIZENS' UTILITY BOARD OF OREGON,
an independent nonprofit public corporation,

*Respondent - Cross-Respondent,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON,
*Cross-Appellant,*

PORTLAND GENERAL ELECTRIC CO.,
*Intervenor Defendant -
Appellant - Cross-Respondent.*

(95C-11300; CA A92935)

UTILITY REFORM PROJECT
and Colleen O'Neil,
*Respondents - Cross-Appellants,*

*v.*

PUBLIC UTILITY COMMISSION OF OREGON,
*Appellant - Cross-Respondent,*

PORTLAND GENERAL ELECTRIC CO.,
*Intervenor - Defendant -*
*Appellant - Cross-Respondent.*

(95C-12542; CA A93400)

962 P2d 744

John W. Stephens argued the cause for appellant Citizens' Utility Board of Oregon. With him on the briefs was Esler, Stephens & Buckley.

Shelly Richardson argued the cause and filed the briefs for intervenor - appellant Public Power Council.

Jas. Adams, Assistant Attorney General, argued the cause for respondent Public Utility Commission. With him on the briefs were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

John R. Faust, Jr., argued the cause for intervenor - respondent and intervenor-defendant - appellant - cross-respondent Portland General Electric Company. With him on the briefs was Schwabe, Williamson & Wyatt.

Daniel W. Meek, argued the cause and filed the briefs for appellants Utility Reform Project, Colleen O'Neil, and Lloyd K. Marbet and respondents - cross-appellants Utility Reform Project and Colleen O'Neil.

Katherine A. McDowell, Clarence M. Belnavis and Stoel Rives, LLP, filed the brief for *amicus curiae* PacifiCorp.

Before Edmonds, Presiding Judge, Armstrong, Judge and Richardson, Senior Judge.

RICHARDSON, S. J.

## RICHARDSON, S. J.

■ These consolidated appeals are from circuit court judgments on review of a series of Public Utility Commission (PUC) orders that allowed Portland General Electric (PGE) to include a "rate of return" (*i.e.,* profit) component, as well as the principal amount of its "undepreciated investment" in the retired Trojan generating facility, in its rates for the years 1995 to 2011. Two different circuit court judges, respectively, affirmed PUC's "declaratory orders," and reversed and remanded its ratemaking order.[1] On appeal, we review PUC's orders directly, rather than reviewing the circuit court judgments *per se. Pacific Northwest Bell Telephone Co. v. Katz,* 121 Or App 48, 51, 853 P2d 1346, *rev den* 318 Or 25 (1993). We conclude that PUC erred in each of the orders.

With the exception of Utility Reform Project and the individuals who appear with it (collectively URP), the parties agree that the principal if not only issue before us in each of the appeals is whether PGE's rates may include the rate of return component, or are instead limited to the recovery of the declining principal amount of the undepreciated Trojan

---

[1] As PUC explains in its brief to us, the "legal issue presented in these cases is less complicated than the [procedural] posture of the various cases would make it appear." PUC also offers the following helpful summary of the procedural posture:

"In A86940, Citizens Utility Board (CUB) appeals from the judgment entered by Judge Barber in Marion Circuit Court No. 94C 10372. In A86973, the Utility Reform Project (URP) and Public Power Council (PPC) appeal from the judgment entered by Judge Barber in Marion County Circuit No. 94C 10417. Those two circuit court proceedings were reviews of PUC Orders No. 93-1117 and 93-1763 issued in the declaratory order (DP 10) proceeding. Both circuit court cases were consolidated at the trial level.

"In A92935, Portland General Electric (PGE) and the Public Utility Commission of Oregon (PUC) appeal from the judgment in Marion County No. 95C-11300, a circuit court review proceeding initiated by CUB. In A93400, PGE and PUC appeal from the judgment in Marion County No. 95C-12542, a circuit court review proceeding initiated by URP. Those two circuit court cases were reviews of PUC Order 95-322, which was rendered in the ratemaking proceeding."

We add that, in our case number A93400, PUC has been designated a cross-appellant, and PGE a cross-respondent as well as an appellant, apparently because PGE's appeal from the judgment in question was filed before PUC's.

It would be more confusing than helpful to refer to the parties by their designations as parties rather than by their names or acronyms. In general terms, PUC, PGE and the *amicus* PacifiCorp agree with PUC's orders; the other parties do not.

investment. As the parties summarize the issue, the opponents of PUC's orders take the view that PGE is entitled to recover through its rates only the return *of* its Trojan investment, while PUC and PGE assert that PGE may *also* recover a return *on* the investment. The parties also agree that a resolution of that issue turns on the applicability or interrelationship of two statutes. ORS 757.355 was enacted through an initiative measure in 1978 (Measure 9), and provides:

> "No public utility shall, directly or indirectly, by any device, charge, demand, collect or receive from any customer rates which are derived from a rate base which includes within it any construction, building, installation or real or personal property not presently used for providing utility service to the customer."

ORS 757.140(2) was enacted by the legislature through Oregon Laws 1989, chapter 956, section 2, and provides:

> "In the following cases the commission may allow in rates, directly or indirectly, amounts on the utility's books of account which the commission finds represent undepreciated investment in a utility plant, including that which has been retired from service:
>
> "(a)   When the retirement is due to ordinary wear and tear, casualties, acts of God, acts of governmental authority; or
>
> "(b)   When the commission finds that the retirement is in the public interest."[2]

■   The parties make numerous arguments regarding the meaning and relationship of the two statutes. Generally speaking, the parties opposing PUC's orders rely mainly on ORS 757.355 and those supporting the orders place their main reliance on ORS 757.140(2). The first specific area of

---

[2] The preexisting part of the statute, now codified as ORS 757.140(1), provides:

"Every public utility shall carry a proper and adequate depreciation account. The commission shall ascertain and determine the proper and adequate rates of depreciation of the several classes of property of each public utility. The rates shall be such as will provide the amounts required over and above the expenses of maintenance, to keep such property in a state of efficiency corresponding to the progress of the industry. Each public utility shall conform its depreciation accounts to the rates so ascertained and determined by the commission. The commission may make changes in such rates of depreciation from time to time as the commission may find to be necessary."

disagreement arises from PUC's and PGE's contention that ORS 757.355 has *no* application to retired facilities, but pertains instead only to plant and facilities that are in developmental stages or that are not yet being used for the provision of utility services. CUB, PPC and URP take the opposite view. PUC and PGE agree that the language of the statute and the history of measure 9 demonstrate that the target of the measure and the concern of the statutes are with rates for "construction work in progress" (CWIP), *i.e.*, uncompleted facilities or those planned for prospective use that are not yet in use. PUC and PGE assert, *inter alia*, that the word "presently," in the statutory phrase "not presently used for providing utility service," is used in the sense that *Webster's Third New International Dictionary,* 1793 (1993) defines as "after a little while," "by and by," "soon," and the like. Relying on an alternative definition in the same dictionary, CUB argues that "presently" is used in the statutes to mean "now" or other formulations synonymous with "currently."

We do not think that the word "presently" specifically or the language of ORS 757.355 generally can plausibly be read as pertaining only to utility property that is not yet in use, and we conclude that the limitations of the statute apply to property that has ceased being used for the provision of services as well as property that has never been so used. As we noted in *Steele v. Employment Department*, 143 Or App 105, 113, 923 P2d 1252, *rev allowed* 324 Or 487 (1996), the fact that a particular word has various meanings, all of which are reflected in the dictionary, does not mean that all of the definitional variations

> "are pertinent whenever the word is used, or that each variation is an arguably plausible description of what the word means as it is used in a particular statute. The subject and purpose of the statute, together with the statutory language that surrounds the word in question, narrow the array of definitional choices that dictionaries alone afford[.]"

In the present case, there are at least two aspects of the surrounding statutory language that are at odds with PUC's and PGE's understanding that the word "presently" and the statute relate only to CWIP and do not also apply to facilities and plant that are no longer in use. First, ORS

757.355 specifically describes the items that are "not presently used" as including "construction, building, installation or real or personal property." Under PGE's and PUC's reading, only the first word in that enumeration would have been necessary. Moreover, unlike "construction," the words that follow it in the quoted language of the statute encompass completed structures and facilities and real and personal property of all kinds. On their face, the referents of those words can and facially do include property that has ceased to be used for the provision of utility services as well as property that never was.

The second significant aspect of the statutory language is that what it proscribes, *inter alia*, is the inclusion in the "rate base" of the property and facilities that are not presently used. "Rate base" is a term of art in the field of public utility regulation. In *Pacific Tel. & Tel. Co. v. Wallace*, 158 Or 210, 231, 75 P2d 942 (1938), the Supreme Court explained:

> "We are well satisfied that the company cannot include within its valuations property which it neither used nor was useful to the public service. Property which was not reasonably necessary to the adequate furnishing of telephone service must be excluded from the rate base[.]" (Citation omitted.)

The principal consequence of inclusion or exclusion is that "[t]he rate base represents the invested capital upon which the utility is entitled to earn a return." *Pacific Tel. & Tel. Co. v. Hill*, 229 Or 437, 444, 365 P2d 1021, 367 P2d 790 (1961).

More recently, in *PP&L v. Dept. of Rev.*, 308 Or 49, 775 P2d 303 (1989), the Supreme Court restated those two concepts in conjunction, and cited ORS 757.355 as the sole authority for either or both of them. The court said:

> " '*Property not in service.*' A * * * basic premise of utility regulation is that a utility should be permitted to earn a return only on property that is reasonably necessary to and actually providing utility service. *See* ORS 757.355. The largest type of property in the property-not-in-service category is construction work in progress (CWIP). When a utility constructs new property, such as a generating facility, that property is not included in the utility's rate base until

it actually is placed in service and, even then, the regulators may not allow it in the rate base until the utility establishes that the property is reasonably necessary to provision of electrical service.

"Another significant type of property in this category is property held for future use (PHFU). This is property—usually unimproved realty—which the utility anticipates it will need in the future but which it is not presently using to provide electric service. As long as such property is not used, the regulators will not allow the utility to earn a return on it." *Id.* at 53-54 (footnote omitted).

Thus, ORS 757.355 would appear to be less an innovative new form of restraint on utility rates than the embodiment of an old one: property that is not "reasonably necessary to and actually providing utility service" is ineligible for either inclusion in the rate base or for a rate of return payable by utility customers. There is no logical basis for applying that principle only to property that is not *yet* reasonably necessary and actually used, but not to property that has *ceased* to be reasonably necessary and actually used. In either instance, the utility provider's profit on its property investment would be derived from ratepayers whom the utility is not using the property to serve. It is, of course, true that the voters of Oregon were not obliged to embody that principle in its entirety in the statute they enacted, and were free to confine its limitations to CWIP. However, the fact that ORS 757.355 refers to completed facilities as well as "construction," and does so in an enumeration of kinds of property that may not be included in a public utility's "rate base," demonstrate both that the statute was meant to apply to property in addition to CWIP and that it used the conventional term "rate base" without in any way suggesting that the term did not carry its conventional meaning. As relevant here, that meaning is one that pertains to and excludes all utility property that is not used for providing utility service, without regard for whether the property was so used in the past or might be so used in the future.

PUC argues further, however, that the "legislative history" of Measure 9 demonstrates that its concern, as communicated to the electorate, was exclusively with CWIP. PUC relies on *Lipscomb v. State Bd. of Higher Ed.*, 305 Or

472, 753 P2d 939 (1988), for the proposition that ballot titles, voters' pamphlet explanations and statements and other artifacts of the electoral process may be consulted in determining the meaning of legislation enacted by the voters, even when the legislation that they have enacted is not ambiguous or susceptible to more than one plausible meaning. Assuming that that proposition in *Lipscomb* survives later Supreme Court decisions in the aftermath of *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), we do not find the history to be helpful to PUC. To whatever extent the materials that were presented to the voters tended to focus more on CWIP than other matters, the reason may have been similar to the Supreme Court's in *PP&L* for using CWIP as its principal example: It was the "largest type of property in the property-not-in-service category." *Id.* at 53. In any event, the materials that the parties cite to us from the voters' pamphlet and other sources are not uniform in emphasizing CWIP to the exclusion of all else. It is also worthy of note that the explanation of the message in the voters' pamphlet, as described in PUC's brief, "merely parrots" the wording of the measure itself. *See* 1978 General Election Voters' Pamphlet 52. PUC draws the conclusion that the explanation therefore "does not shed any light on the meaning of the phrase 'not presently used.'" While that is certainly correct, the conclusion seems also to follow that the committee appointed to draft the explanation was of the view, as are we, that the meaning of that phrase and of the measure as a whole needed no illumination that the language of the measure itself did not provide.

The "legislative history" is neither contrary to nor as clear as the language of the statute. We conclude that ORS 757.355 is applicable to retired utility facilities and plant, as it is to other utility property that is not currently used in connection with the provision of services. The remaining question is how that statute and ORS 757.140(2) apply in combination to the issues at hand.[3]

■     PUC and PGE take the position that ORS 757.140(2) allows the agency to establish rates that include a return on

---

[3] As best we understand, the only party to suggest that OR 757.140(2) is not applicable at all is URP. We reject its arguments to that effect without discussion.

a utility's undepreciated investment in retired assets, in addition to the recoupment of the undepreciated principal amount of the investment. They contend that, if ORS 757.355 applies at all and is to the contrary, ORS 757.140(2) prevails, because it is the later enacted statute and the one that applies more specifically to the reflection in a utility's rates of its investment in retired facilities. The opposing parties' arguments are essentially the mirror image of PUC's and PGE's. As exemplified by CUB's argument, their view is that ORS 757.140(2) does not by its own terms expressly allow a return on investment in retired plant and facilities, and that the two statutes can be harmonized by giving effect to both the specific prohibition in ORS 757.355 against a return *on* investment in unused property and the permissibility under ORS 757.140(2) of a return *of* investment in facilities that are unused because of retirement.

ORS 757.140(2) deals with rates for "undepreciated investment" in "a utility plant, including" retired facilities.[4] PUC and PGE maintain that, by its own terms, that statute does not expressly preclude, and can and should be construed as authorizing, a return on as well as a return of the investment. They bolster that basic argument in a number of ways. For example, PUC points out that, under its standard practice and under "standard ratemaking theory," a utility may recover rates that include a rate of return on undepreciated investments "for active generating facilities." PUC and PGE also contend that, under the statutes, PGE could have been allowed to charge rates enabling it to recover the entire undepreciated investment in Trojan immediately or quickly, rather than rates that spread the recovery over the period from the present through 2011; hence, PGE is *ipso facto* entitled to "interest" on what amounts to a deferred balance, as a matter of basic financial practice.[5] PUC and PGE conclude that, insofar as ORS 757.355 says anything to the contrary, the interpretive principles of "later enactment" and of specific

---

[4] Depreciation is treated as an operating expense for ratemaking purposes. However, ORS 757.140(2) is not concerned with depreciation, but with the undepreciated portion of a utility's investment in physical property.

[5] The trial judge in the ratemaking case did not agree with the premise that the "immediate recovery" of the entire amount was permissible, because "rate shock" would have resulted. *See* ORS 756.040(1). That question is not before us.

provisions prevailing over general ones require that the provisions of ORS 757.140(2) prevail.

CUB responds that, before resort to those principles is permissible, "the two statutes should be read together and harmonized, if possible, while giving effect to a consistent legislative policy." *Fairbanks v. Bureau of Labor and Industries,* 323 Or 88, 94, 913 P2d 703 (1996). We have already concluded that ORS 757.355 is applicable to retired facilities such as Trojan and so, of course, is ORS 757.140(2).[6] We have also concluded that ORS 757.355 precludes public utilities from charging and PUC from approving exactly what PUC and PGE urge us to interpret ORS 757.140(2) as allowing— rates that include a return on a utility's investments in assets that are not being used for utility services to the ratepayers. ORS 757.140(2) contains no *express* language that contemplates a return or profit on undepreciated investment. Even assuming that the statute *could* be read in the way PUC and PGE do, it can at least as plausibly be read, by its own terms, as allowing only the rates necessary to compensate utilities for the principal amount of their undepreciated investment in their unused or retired property. To read it in the first way would be to construe it as conflicting with ORS 757.355. To read it in the second way would be to construe the two statutes harmoniously and consistently. We read it in the second way.

PUC's and PGE's secondary arguments add no strength to their basic one. Assuming the correctness of PUC's practice of allowing a rate of return on undepreciated investment in active facilities, there is no analogy between that and the rate treatment for retired or otherwise unused facilities. ORS 757.355 does not preclude a return on a utility's investment in active facilities; it applies only to unused property.[7] Correspondingly, PUC's and PGE's arguments

_____

[6] The parties apprise us that 1989 Senate Bill 78, which was ultimately enacted as ORS 757.140(2), at one point contained the introductory clause, "[n]otwithstanding the provisions of ORS 757.355." Although legislative history plays no role in our decision, we do note that the clause demonstrates that the legislature was actually—as well as presumptively—aware of ORS 757.355 at the time it adopted ORS 757.140(2).

[7] CUB also bases its argument on the phrase in ORS 757.140(2) that allows the inclusion in rates of "amounts on the utility's books of account which [PUC] finds represent undepreciated investment in a utility plant[.]" CUB asserts that "[t]here

that turn on the word "interest" instead of the term "rate of return" also lose sight of ORS 757.355. That statute, as we interpret it, does not allow public utilities to obtain a profit from ratepayers on their investments in facilities that are not used to serve ratepayers. It makes no difference whether the profit is called "interest" instead of a "return." We conclude that, read together, ORS 757.140(2) and ORS 757.355 allow only the principal amount of the undepreciated investment to be recovered through rates.

PUC and PGE also argue that, whether or not we might read the statutes in the same way, we should defer to the agency's interpretation of ORS 757.355 and ORS 757.140(2). PUC points to our statement in *Pacific Northwest Bell Telephone Co. v. Katz*, 116 Or App 302, 309 n 5, 841 P2d 652 (1929), *rev den* 316 Or 528 (1993), that ORS 756.040 and other general empowering statutes have given PUC "the broadest authority—commensurate with that of the legislature itself—for the exercise of [its] regulatory function" (quoting *Pacific N .W. Bell v. Sabin*, 21 Or App 200, 214, 534 P2d 984, *rev den* (1975)). However, we added in *Katz* that, "[o]f course, PUC's exercise of its authority is limited by the boundaries of the legislature's delegation." *Id.* at 309 n 5.

■■ CUB contends, and we agree, that ORS 757.355 and ORS 757.140(2) are not "delegative" statutes—the kind which carry with them the highest level of judicial deference in reviewing agency interpretations. *Springfield Education Assn. v. School Dist.*, 290 Or 217, 621 P2d 547 (1980). Rather, the statutes reflect a "completed legislative policy judgment," albeit one expressed in "inexact terms," and we review the agency's statutory interpretation to ascertain whether it "coincides with the legislative policy which inheres in the

---

are no amounts on a utility's books of account representing a 'rate of return,'" as distinct from the "undepreciated investment itself." *See* OAR 806-27-045(1); 18 CFR Part 101. Hence, CUB concludes that a return component cannot qualify for inclusion in rates under ORS 757.140(2) because such a component cannot be reflected in the books of account.

We need not reach that argument to decide this case. It is sufficient here to hold that, reading ORS 757.355 and ORS 757.140(2) together, the rates may not include a return component on undepreciated investment in retired or otherwise unused property. The argument discussed in this footnote, if correct, might bear on whether a return component may be included under ORS 757.140(2) for a utility's actively used facilities to which ORS 757.355 does not apply.

meaning of the statute." *Springfield,* 290 Or at 224-25, 228. Ultimately, the meaning of the statutes under that standard of review is a question of law for the court to decide, after giving appropriate consideration and weight to the agency's interpretation. *See 1000 Friends of Oregon v. LCDC (Lane Co.),* 305 Or 384, 388-92, 752 P2d 271(1988); *see also Springfield,* 290 Or at 224. For the reasons we have given, we interpret ORS 757.355 and ORS 757.140(2) differently from the way the agency did, and the applicable standard of review does not require us to defer to the agency's interpretation under those circumstances.

■        However, in addition to the "deference" facet of PUC's argument, there appears also to be a second point— that the scope of its authority to regulate rates, under ORS 756.040[8] and other statutes that confer and define its general powers, give it the latitude to apply the specific statutory provisions here in the way that it did. CUB and the other parties opposing the orders take the opposite view, *i.e.,* that where statutes containing specific provisions relating to rates are applicable, they control and narrow PUC's general authority in the specific circumstances to which they apply.

Somewhat ironically, the case that CUB cites that best supports its argument here is one where CUB made an argument similar to PUC's in this case and we agreed with the opposite view that PUC took there. In *Pacific Northwest Bell Telephone Co. v. Eachus,* 135 Or App 41, 898 P2d 774, *rev den* 322 Or 193 (1995), PUC conducted an "own motion" proceeding, in which it concluded that the utility's existing

---

[8] That statute provides, as material:

"(1)  In addition to the powers and duties now or hereafter transferred to or vested in the Public Utility Commission, the commission shall represent the customers of any public utility or telecommunications utility and the public generally in all controversies respecting rates, valuations, service and all matters of which the commission has jurisdiction. In respect thereof the commission shall make use of the jurisdiction and powers of the office to protect such customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates.

"(2)  The commission is vested with power and jurisdiction to supervise and regulate every public utility and telecommunications utility in this state, and to do all things necessary and convenient in the exercise of such power and jurisdiction."

rates were generating excessive revenue and ordered it to reduce its rates effective at the beginning of 1990. CUB sought to have the existing rates declared "interim" and, therefore, subject to customer refunds from the time the proceeding was initiated approximately one year before the order requiring the rate reduction was entered. PUC concluded that it lacked the authority to do what CUB sought. The circuit court affirmed and, on appeal, we affirmed in turn. We said:

> "ORS 756.040(1) authorizes PUC to protect ratepayers and the public 'from unjust exactions and practices and to obtain for them adequate service at fair and reasonable rates.' ORS 756.040(2) vests powers in the commission 'to do all things necessary and convenient' in the exercise of its jurisdiction. CUB contends that within those broad grants of authority to oversee ratemaking, the legislature has given to PUC the power to issue an order declaring existing rates to be interim.
>
> "We agree that the text of those statutes [is] broad enough to permit the type of order that CUB seeks. However, other provisions of the public utility statutes show that PUC's authority to declare rates to be interim and subject to refund is circumscribed." *Id*. at 48-49.

After discussing the other statutory provisions, we concluded that, notwithstanding the broad and general grant of ratemaking authority under ORS 756.040, the specific statutes dealing with the process for establishing and changing rates, *e.g.,* ORS 759.205, precluded PUC from taking the action that CUB desired. *Id.* at 49-50.

Similarly, in this case, ORS 757.355 precludes PUC from allowing rates, of the kind its orders here would allow, that include a rate of return on capital assets that are not currently used for the provision of utility services; ORS 757.140(2) authorizes rates that would reimburse the utility for its principal investment in retired capital assets, but it does not authorize the return on the investment that ORS 757.355 proscribes. Like the specific statutes that "circumscribed" PUC's authority in *Eachus*, ORS 757.355 and ORS 757.140(2) as we have interpreted them disallow the return component that the PUC orders allowed for PGE's investment in Trojan. The general grants of authority in ORS

756.040 and other general statutes do not empower PGE to charge or PUC to approve rates of a kind that are specifically contrary to the limitations in ORS 757.355 and ORS 757.140(2).

We have considered the parties' other assignments and arguments and either need not reach them or find them not to warrant further discussion.

Judgments in case numbers A86940 and A86973 reversed and remanded with instructions to remand orders to PUC for reconsideration; judgments in case numbers A92935 and A93400 affirmed on appeals and cross-appeals.