Argued and submitted May 20, 2014, affirmed April 6, 2016

UTILITY REFORM PROJECT,
*Petitioner,*

*v.*

OREGON PUBLIC UTILITY COMMISSION
and Portland General Electric Company,
*Respondents.*

Public Utility Commission of Oregon
UM1402; A150814

372 P3d 517

Daniel W. Meek argued the cause and filed the briefs for petitioner.

Michael Casper, Deputy Solicitor General, argued the cause for respondent Oregon Public Utility Commission. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General.

James N. Westwood argued the cause for respondent Portland General Electric Company. With him on the brief was Stoel Rives LLP.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

In another installment of a long-running dispute related to the closure of the Trojan nuclear power plant, petitioner seeks judicial review of an order of the Public Utility Commission (PUC) that granted respondent Portland General Electric's (PGE) request to amortize in its rates certain costs of issuing a refund to ratepayers.

Petitioner challenges the PUC's order on several grounds, asserting that the order is unlawful because (1) charging ratepayers for administering the refund violates ORS 757.355, (2) the PUC prevented petitioner from challenging the refund mechanism used by PGE, (3) the rate treatment approved by the PUC does not result in rates that are "fair, just, and reasonable," (4) the PUC failed to order PGE to "forfeit the amount it retained for uncashed refund checks," (5) the PUC, in approving PGE's application to amortize the refund costs, applied an incorrect "earnings test," and, (6) the PUC's order was not supported by substantial evidence. We reject petitioner's arguments for the reasons expressed below, and affirm the PUC's order.

## I. BACKGROUND

The precise issue on review is whether the PUC permissibly allowed PGE to recover the administrative costs of issuing a PUC-ordered refund to ratepayers. To place that question in context, however, some extensive factual and procedural background is required.

PGE began commercial operation of the Trojan nuclear power plant in 1976. At that time, the PUC authorized PGE to recover its capital investment in Trojan and a return on its investment in rates over a 35-year period. In 1993, after problems arose at Trojan, PGE retired the facility, at least in part, because it was cheaper for PGE to replace Trojan's power output with purchased power than to continue operating the facility.

### A. *Order Nos. 93-1117 and 95-322, and* Trojan I

PGE wished to recover the remaining balance of its capital investment in Trojan. In response, the PUC issued Order Nos. 93-1117 and 95-322, which, together, allowed

PGE's rate base to include both a return of and a return on PGE's Trojan investment. Those orders were appealed. In *Citizens' Utility Board v. PUC*, 154 Or App 702, 716-17, 962 P2d 744 (1998), *rev dismissed*, 335 Or 91 (2002) *(Trojan I)*, we concluded that ORS 757.140(2) and ORS 757.355 (1993)[1] authorized a return *of* PGE's principal investment in the retired facility, but not a return *on* its investment in the retired facility. We therefore remanded the orders to the PUC for reconsideration. *Id.* at 717.

B.  *Settlement, Order Nos. 00-601 and 02-227, and* Dreyer

The Supreme Court allowed review of our decision in *Trojan I*, but then held the case in abeyance "when certain events occurred that appeared to have some potential for resolving the controversy without the court's participation." *Dreyer v. PGE*, 341 Or 262, 269, 142 P3d 1010 (2006). One of those events was a settlement between PGE and Citizens' Utility Board, in which PGE agreed to offset its remaining Trojan investment balance and certain tax liabilities against certain existing credits in favor of PGE's ratepayers. *Id.* That is, the settlement removed PGE's remaining undepreciated investment in Trojan from prospective rates.

PGE applied to the PUC for an accounting order and revised rate schedules implementing the terms of the settlement; the PUC approved the request, effective October 1, 2000, in Order No. 00-601. *Id.* Petitioner, which was not a party to the settlement, challenged Order No. 00-601 in a proceeding before the PUC, arguing, in part, that the revised rates improperly allowed PGE to retain the return *on* investment that it had collected from ratepayers between 1995 and 2000. *Id.* at 270. That is, petitioner contended that the PUC merely provided prospective relief to ratepayers without providing a mechanism for returning ratepayers' money that PGE had collected unlawfully between 1995 and 2000. *Id.*

---

[1] ORS 757.355 (1993) codified Oregon voters' approval of Ballot Measure 9 in 1978. We have described the effect of that law as follows: "[T]he costs of a plant not 'presently' providing service to customers must be excluded from the utility's rates." *Utility Reform Project v. PUC*, 215 Or App 360, 364, 170 P3d 1074 (2007).

The PUC rejected petitioner's challenge to Order No. 00-601 in Order No. 02-227, concluding that, under the "filed-rate doctrine," it lacked authority to order PGE to refund the "return on investment" money that PGE had collected between 1995 and 2000. Petitioner sought review of that order in Marion County Circuit Court, which agreed with petitioner, reversed and remanded Order No. 02-227, and instructed the PUC to order PGE to immediately issue refunds for the full amount of all "excessive and unlawful charges" collected by PGE for its return on investment. *Id.* at 271-72. The PUC appealed that ruling, which ultimately resulted in our decision in *Utility Reform Project v. PUC*, 215 Or App 360, 170 P3d 1074 (2007) (*Trojan II*). Notably, however, the circuit court's judgment was not stayed pending our review in *Trojan II*.

While the PUC's appeal in *Trojan II* was pending before us, certain ratepayers, based on our decision in *Trojan I*, brought civil actions against PGE seeking refunds of the amounts that they had paid between 1995 and 2000 that were attributable to a return on investment. *Dreyer*, 341 Or at 273. Those plaintiffs each sought relief in four separate claims and sought certification as a class. PGE moved for dismissal of the civil suits, arguing, in part, that jurisdiction lay with the PUC. *Id.* at 275. The circuit court denied PGE's motion to dismiss and certified the ratepayers as a class. PGE then petitioned the Supreme Court for alternative writs of mandamus, asking the court to dismiss the plaintiffs' complaints and to vacate the circuit court's class-certification order. *Id.* at 276.

In *Dreyer*, the Supreme Court initially concluded that, at the very least, the plaintiffs' first claim was legally tenable. *Id.* at 280. In that claim, the plaintiffs had alleged that PGE had violated ORS 757.355 (1993) by charging and receiving rates that included a return on investment, and that, under ORS 756.185(1), PGE was liable to the plaintiffs for damages that they had sustained in consequence of that violation. *Id.* at 273-74. Because at least one of the plaintiffs' claims was viable, the court concluded that it could not grant the relief requested by PGE—*i.e.*, the dismissal of the plaintiffs' complaint on the theory that none of the claims had

any basis in the law. *Id.* at 279-80. The court also rejected PGE's argument that, under ORS 756.225, the circuit court lacked jurisdiction because the plaintiffs' claims necessarily involved ratemaking or pertained to utility regulation. *Id.* at 282-83.

The court also concluded, however, that the civil proceedings should be abated because the PUC was engaged in contemporaneous proceedings to determine essentially the same controversy involving the same ratepayers (*i.e.,* the PUC, on remand from *Trojan I*, had been tasked with fashioning a remedy for the ratepayers, and the PUC was also faced with the remand from the circuit court of Order No. 02-227, which instructed the PUC to order refunds to ratepayers for the amount improperly collected by PGE). The court reasoned that, under the doctrine of primary jurisdiction, before the plaintiffs' civil case could continue, the PUC should be the one to initially determine "what, if any, remedy it can offer to PGE ratepayers, through rate reductions or refunds, for the amounts that PGE collected in violation of ORS 757.355 (1993) between April 1995 and October 2000." *Dreyer*, 341 Or at 286.

C.  Trojan II

Contemporaneous with the proceedings in *Dreyer*, we were reviewing the PUC's appeal of the circuit court's judgment reversing and remanding Order No. 02-227. However, because that judgment was not stayed pending appeal, the PUC decided that it would consider the remanded order along with the orders that had been remanded in *Trojan I* in a joint proceeding. The PUC

> "decided to proceed with the two remands together, but in two phases, with the first phase devoted to determining '[w]hat rates would have been approved in [PUC Order No. 95-322] if ORS 757.355 [(1993)] had been interpreted to prohibit a return on Trojan,' and the second phase devoted to reconciling the results of Phase I with the rates that actually were approved."

*Dreyer*, 341 Or at 272 (quoting Order No. 04-597) (brackets in *Dreyer*).

Meanwhile, in *Trojan II*, we were asked to review the circuit court's determination that the rates approved by the PUC in Order No. 02-227 "were 'neither just nor reasonable' because the PUC erred as a matter of law in concluding that ORS 757.225 precluded it from addressing the recovery of past, unlawful charges when determining the offsetting charges and liabilities related to Trojan." 215 Or App at 371. Because, in the interim, the Supreme Court's decision in *Dreyer* had made clear that the PUC, in its conclusions in Order No. 02-227, had misinterpreted ORS 757.225, PGE and the PUC conceded that their appellate arguments based on that statute could not stand. We then concluded that we could not determine whether the rates established in Order No. 02-227 were unlawful or unreasonable until the PUC had reconsidered the issues presented to it in the various remand proceedings that were then ongoing. *Trojan II*, 215 Or App at 373. We did note, however, that the circuit court's remand instruction ordering the PUC to revise the rate structure to account for unlawfully collected rates or to order a refund of the unlawfully collected charges was erroneous in light of the "primary jurisdiction" analysis in *Dreyer*. We explained that, after *Dreyer*,

> "there are alternative ways in which ratepayers could attempt to obtain a refund of unlawfully collected amounts: They could seek a refund, as they did in this case, through a rate reduction or refund through the PUC, or they could proceed in circuit court against PGE, as the class action plaintiffs did in *Dreyer*. Whether the former avenue should be utilized, the Supreme Court held, is a matter that should be determined, in the first instance, by the PUC[.]"

*Trojan II*, 215 Or App at 374 (footnote omitted). Accordingly, we vacated the circuit court's judgment, and remanded Order No. 02-227 to the PUC for reconsideration in light of *Dreyer*, our decision in *Trojan I*, and the "PUC's joint remand proceedings." *Trojan II*, 215 Or App at 376.

D. *Order No. 08-487,* Gearhart I, *and* Gearhart II

In sum, after our decisions in *Trojan I* and *Trojan II* and the Supreme Court's opinion in *Dreyer*, the PUC was tasked with reconsidering both the rates that the PUC had

approved and that PGE had charged ratepayers between April 1995 and September 2000, and rates charged after October 1, 2000. After extensive joint remand proceedings on those issues, the PUC issued Order No. 08-487.

As the Supreme Court later explained in its decision reviewing Order No. 08-487,

"[t]hat order began by resolving three threshold issues. First, the PUC explained that *Trojan I* had not declared the 1995 to 2000 *rates* unlawful, but rather had held that the rate *order* was based on an error of law. The PUC concluded that even if the rate order was erroneous, the overall rates themselves could be lawful.

"Second, the PUC determined that it had authority to order a utility to issue refunds in limited circumstances, including when necessary to 'remedy an error indentified by a reviewing court on appeal.' The PUC appeared to conclude that that authority stemmed from ORS 756.040, which gives the PUC authority to do 'all things necessary and convenient' in the exercise of its legislatively delegated powers.

"Third, the PUC clarified its understanding of this court's decision in *Dreyer*, particularly noting that this court had not determined the scope of the filed rate doctrine or its impact on the PUC's remedial authority. On the contrary, noted the PUC, this court had left it to the PUC to determine in the first instance whether and to what extent the PUC had remedial authority."

*Gearhart v. PUC*, 356 Or 216, 226-27, 339 P3d 904 (2014) (*Gearhart II*) (emphasis in original).

The PUC then applied its resolution of those threshold issues to its task on remand. The PUC decided that it had to determine whether both the 1995 to 2000 rates and the post-2000 rates were just and reasonable by "examining what rates it *would* have approved for the period from 1995 to 2000 if it had known that it could not authorize PGE to recover a return on its investment in Trojan." *Id.* at 227 (emphasis added). In performing that task, the PUC concluded that ratemaking principles should guide its analysis. Therefore, the commission reexamined "elements of the

revenue requirement that were affected by the decision in *Trojan I*" and then compared the new revenue requirement with that approved in 1995. *Id.*

In particular, the PUC "shortened the amortization period from 17 years to 10 years because, without the opportunity to earn a return on its investment in Trojan, recovery of PGE's investment over 17 years 'would likely increase PGE's risk profile.'" *Id.* at 228. Therefore, the PUC concluded that, had it not provided for a return *on* investment, it would have used the shorter amortization period. The PUC also determined that it would have allowed PGE to recover "'some form of interest—not profit—to compensate the utility for the delayed recovery of the investment.'" *Id.* The PUC settled on a lower interest rate than it would have normally allowed because it wanted the rate to reflect "only the time value of money, and not any risk premiums, profit, or other return on investment." *Id.* Based on its reexamination, the PUC concluded that the 1995 to 2000 rates would have been $4.03 million *higher* than the authorized rates. Therefore, the PUC concluded that the error identified in *Trojan I* had not resulted in unjust and unreasonable rates from 1995 to 2000. *Id.* at 229.

The PUC further explained that "its recalculation of the 1995 to 2000 rates also would have affected the rates it would have set following the 2000 settlement." *Id.* Had the PUC used the 10-year amortization period, the remaining Trojan balance at the time of the settlement would have been "$15.4 million less than the balance it had actually used to calculate the settlement." *Id.* Therefore, fewer ratepayer credits would have been needed to offset the remaining Trojan balance, leaving more credits on PGE's books to benefit ratepayers following settlement. The PUC ordered PGE to compensate the post-2000 ratepayers in the form of a $33.1 million refund for the difference between the rates approved after the settlement and "the rates that would have been approved if the remaining balance had been $15.4 million lower." *Id.* With the refund, the PUC concluded that "'the settlement was reasonable and appropriate, and that the resulting rates were just and reasonable.'" *Id.* (quoting Order No. 08-487).

Accordingly, the PUC concluded in Order No. 08-487 that (1) PGE's rates from April 1995 through September 2000 were just and reasonable, (2) PGE's rates from October 2000 through September 2001 were just and reasonable, (3) PGE must refund $33.1 million to customers who received service from October 2000 to September 2001 to account for "the difference between the balance derived from rates that included a return on PGE's remaining Trojan investment and the balance derived from adjusted rates that excluded that return," and (4) PGE "may seek recovery of the incremental administrative costs of implementing the refund mechanism by seeking a deferral of costs through an application filed pursuant to ORS 757.259."

Order No. 08-487 also included a section outlining the refund mechanism or "appropriate procedure to provide [the] refund." That section directed PGE to take steps to broadly announce the ability of eligible customers to obtain a refund, including notification by mail and newspaper advertisements. The PUC also instructed PGE to distribute the refund in the form of a credit or check to current customers, and by check to former customers.

Petitioner and others sought judicial review of Order No. 08-487 on several grounds. At issue on review was (1) whether the PUC had misunderstood and exceeded its authority on remand; (2) whether the PUC had authority to order PGE to issue refunds to its customers; (3) whether the PUC erred in allowing PGE to recover interest to account for the time value of money; (4) whether substantial evidence supported the order; and (5) whether the plaintiffs in the class action proceeding could proceed in the circuit court. *Gearhart II*, 356 Or at 231. In *Gearhart v. PUC*, 255 Or App 58, 299 P3d 533 (2013), *aff'd*, 356 Or 216, 339 P3d 904 (2014) (*Gearhart I*), we affirmed Order No. 08-487 in its entirety. The Supreme Court accepted review, and also affirmed on all grounds. *Gearhart II*, 356 Or at 241-49, 253.

E. *Order No. 11-520*

During the pendency of *Gearhart I*, PGE, in response to the part of Order No. 08-487 that authorized PGE to

"seek recovery of the incremental costs of implementing the refund mechanism," filed requests in October 2010 and February 2011 to recover $2,494,504 (plus interest) in deferred administrative costs through rates amortized over one year.[2] With interest, the total exceeded $2.9 million.

PGE and the PUC's staff reached a proposed stipulation to allow PGE to amortize the full amount of the deferred costs in rates over a one-year period. Petitioner intervened in the PUC proceeding and raised several objections to the proposed stipulation. As the PUC understood petitioner's objections, they rested on three arguments: (1) the deferred expenses were not prudently incurred and should have been offset from unclaimed refund amounts; (2) authorizing amortization of the deferred administrative costs in customer rates does not result in fair, just, and reasonable rates; and (3) PGE's deferral request was legally and procedurally deficient. After extensive contested case proceedings, the PUC rejected petitioner's objections and adopted the stipulation through Order No. 11-520.

In Order No. 11-520, the PUC first addressed petitioner's arguments that the amount of deferred expenses was excessive and that PGE should have offset its administrative costs with funds from unclaimed refunds. The PUC concluded that, even if the refund methodology used by PGE was not the "least cost option," it was consistent with the PUC's instruction in Order No. 08-487 to "maximize customer participation." The PUC also concluded that the methodology had proved "extremely effective" at maximizing participation and any increased costs were outweighed by "increased efficiencies and by equity in refund receipt times." As to the unclaimed refund amounts, the PUC determined that unclaimed property laws required PGE to remit the unclaimed funds to the states where the intended recipients lived; thus, as a matter of law, PGE was not entitled to retain those amounts to offset its administrative costs.

---

[2] Before PGE administered the refund, it filed an initial application in November 2008 under ORS 757.259 to defer its anticipated administrative costs for later ratemaking treatment. The PUC granted the application in Order No. 09-133 in April 2009. PGE sought reauthorization of the deferral in November 2009, which the PUC granted in Order No. 09-474 in December 2009.

Second, the PUC rejected petitioner's argument that the amortization of deferred expenses resulted in rates that were not fair, just, and reasonable. The PUC disagreed with petitioner that it was allowing PGE to charge customers for administering a refund that was necessitated by PGE's "unlawful" conduct. In the PUC's view, it had never concluded that PGE had acted "unlawfully"; rather, PGE had acted in compliance at all times with the PUC's orders, and the refund resulted from "an error in legal interpretation made by the [PUC]." The PUC also rejected petitioner's argument that charging current customers for administering a refund to 2000-2001 customers was not fair, just, or reasonable, concluding that petitioner failed to articulate a basis for that position.

Third, the PUC rejected petitioner's argument that there were legal and procedural deficiencies in PGE's deferral request. The PUC concluded that PGE's recovery of deferred administrative costs did not violate the prohibition in ORS 757.355 against recovering a return on investment in the retired Trojan facility because PGE had refunded the full amount that the PUC had ordered. The PUC disagreed with petitioner's assertion that recovering administrative costs from current customers was the same as "refunding less of the unlawful charges." The PUC also rejected petitioner's argument that it had used the wrong "earnings test" required by ORS 757.259(5), noting that it had rejected the same argument in an earlier case that was then on appeal. The PUC explained that it was adhering to its decision in the earlier case. Finally, the PUC rejected arguments by petitioner that the refund instructions adopted in Order No. 08-487 were unlawful because the parties were not granted an opportunity to dispute the process for administering the refund. The PUC noted that PGE had complied with the refund instructions in Order No. 08-487, and that petitioner's arguments about the legality of those instructions were pending in *Gearhart I.*

## II. ANALYSIS

Petitioner seeks review of Order No. 11-520, asserting that the order contains a series of legal errors and is not supported by substantial evidence. The PUC and PGE

respond that a number of the arguments made by petitioner have been conclusively decided against petitioner in earlier iterations of the litigation and that the remaining arguments are without merit. We begin by addressing petitioner's assertions of legal error.

## A. *Asserted Errors of Law*

Petitioner asserts five legal errors in Order No. 11-520: (1) the rate treatment adopted in Order No. 11-520 violates ORS 757.355; (2) Order No. 11-520 improperly concluded that Order No. 08-487 had established that PGE could charge ratepayers the costs of administering the refund; (3) the rate treatment in Order No. 11-520 is not "fair, just, and reasonable"; (4) the PUC improperly failed to require PGE to forfeit the amount that it "retained" for uncashed refund checks; and (5) the PUC applied an incorrect "earnings test" in Order No. 11-520. We address petitioner's arguments in turn.

### 1. *ORS 757.355*

Petitioner claims that Order No. 11-520 violates ORS 757.355[3] in essentially the same way that the PUC orders at issue in *Trojan I* violated the statute—*i.e.*, that allowing PGE to recover the administrative costs of issuing the refund is the same as allowing PGE to recover a return *on* its investment in Trojan. Petitioner argues that allowing PGE to charge ratepayers the costs of administering the refund allows PGE to refund less of the $33.1 million than the PUC ordered it to refund in Order No. 08-487, and, consequently, "ratepayers as a whole will not receive the full amount of the ordered refund." In petitioner's view, PGE's recovery of the administrative costs means that "the PUC-quantified unlawful charges are not fully returned to ratepayers but are instead retained by the utility" and "is nothing more than compensation to PGE for having violated ORS 757.355."

The PUC counters that ORS 757.355 is not applicable to the circumstances of this case and that, regardless,

---

[3] The legislature amended ORS 757.355 in 2003, Or Laws 2003, ch 202, § 2, but none of the parties asserts that those amendments are pertinent on appeal.

petitioner's argument is based on the flawed premise that the 2000 to 2001 rates that formed the basis of the refund ordered in Order No. 08-487 were "unlawful." As the PUC points out, Order No. 08-487 determined that the *rates* that PGE charged ratepayers from 1995 to 2000 and 2000 to 2001 were just and reasonable, and that order has since been affirmed. *See Gearhart II*, 356 Or at 253. The PUC also explains that the $33.1 million refund resulted from its reexamination of PGE's rates, which was required to correct the legal error identified in *Trojan I*. Accordingly, the PUC maintains that the refund was not "a refund of a return on investment in a defunct facility."

We agree with the PUC that Order No. 11-520 does not violate ORS 757.355. In *Trojan I*, we concluded that ORS 757.355 "does not allow public utilities to obtain a profit from ratepayers on their investments in facilities that are not used to serve ratepayers." 154 Or App at 714. Notably, we interpreted the proscription contained in ORS 757.355 as limited to "profit" or "return on investment." *Id.* Accordingly, the question presented by petitioner is whether PGE's recovery of the administrative costs of issuing the refund equates to PGE obtaining a profit on the Trojan facility.

Before we answer that question, we briefly examine the Supreme Court's treatment of *Trojan I* in *Gearhart II*. In that case, the court analyzed whether, in reexamining the 1995 to 2000 rates and changing the relevant period for PGE to recover its return of investment (from 17 years to 10 years), the PUC had appropriately included in its rate calculations "interest on the investment to compensate for the time value of money." *Gearhart II*, 356 Or at 248 (internal quotation marks omitted). The petitioners argued that *Trojan I* prohibited the PUC from including interest in its calculation of rates because interest was essentially a return on investment. The court disagreed, concluding that PGE could recover interest in that form because, in the public-utility context, return on investment is distinguishable from interest. *Gearhart II*, 356 Or at 249. According to the court, the PUC's use of an interest rate that accounted for the "time value of money" rather than the "risk of investment" indicated that the PUC had been careful not to

"recalculate rates using a factor that would allow PGE to recover a profit on its investment." *Id.* at 250. In short, the court held that *Trojan I* prevented the PUC from allowing a return on PGE's investment in Trojan, but did not prevent the PUC from allowing PGE to recover interest to account for the time value of money. Similarly, here, the question raised by petitioner is whether PGE's recovery of the administrative costs of issuing a refund constitutes a "return on investment" or "profit." For the reason explained below, we conclude that it does not.

Although it is true that the $2.4 million incurred by PGE to administer the refund is passed on to ratepayers as a result of Order No. 11-520, we reject petitioner's assertion that PGE's recovery of administrative costs that it *actually incurred* qualifies as "profit." The PUC ordered PGE to issue a $33.1 million refund, which it did. In doing so, PGE incurred $2.4 million in administrative costs, which are appropriately considered by PGE as expenses. Accordingly, at the end of the refund process, PGE had refunded $33.1 million and incurred $2.4 million in expenses, totaling approximately $35.5 million. Petitioner's argument seems to assume that the administrative costs of the refund are not actual expenses that PGE incurred. That assumption finds no support in the record. Therefore, we disagree with petitioner that PGE's recovery of expenses related to administering the refund means that PGE retained "unlawful charges" or has been "compensated" for violating ORS 757.355.

In short, PGE's recovery of the administrative costs does not equate to receiving a "return on investment" in Trojan. As the court explained in *Gearhart II*, a return on investment "describe[s] the compensation which the owners receive over and above allowable deductions from gross revenues. It is a word having a connotation different from such words as earnings, net income, interest, and dividends." 356 Or at 249. Recovery of administrative costs actually incurred by PGE is not compensation "over and above allowable deductions from gross revenues." Accordingly, PGE is simply recovering administrative expenses that it incurred, which does not violate the prohibition in ORS 757.355.

## 2. *Refund Mechanism*

Petitioner's second asserted error attacks conclusions in Order No. 11-520 related to the refund mechanism contained in Order No. 08-487. The exact nature of petitioner's asserted error is somewhat unclear. As best we can tell, petitioner is complaining that it never received an opportunity to challenge the particulars of the refund mechanism, and that the PUC took inconsistent positions in the judicial review proceedings of Order No. 08-487 and the PUC proceedings in this case as to whether Order No. 08-487 had conclusively established that PGE could recover the administrative costs it incurred without appropriate review of those costs.

As noted, the PUC concluded in Order No. 11-520 that PGE had appropriately followed the refund methodology set forth in Order No. 08-487, and to the extent that petitioner was challenging that specific methodology, that issue was properly before the courts in the review of Order No. 08-487.

To the extent that petitioner is challenging the legality of the refund mechanism in Order No. 08-487, that issue is foreclosed by the affirmance of that order in *Gearhart II*. To the extent that petitioner is arguing that the PUC took inconsistent positions and should be estopped from "asserting that Order No. 08-487 authorized charging ratepayers for the refund administrative cost," we have reviewed the record of the proceedings before the PUC, and we conclude that the PUC has not taken inconsistent positions.

## 3. *Fair, Just, and Reasonable Rates*

Petitioner claims that the rates that resulted from Order No. 11-520, which include the deferred administrative costs of the refund, violate the requirement in ORS 757.210(1)(a), that rates be "fair, just and reasonable." Petitioner's argument rests on the assertion that it is not fair, just, and reasonable to charge ratepayers the cost of "correcting [unlawful] conduct" by PGE. Petitioner also contends that the PUC impermissibly placed the burden on petitioner to demonstrate that the rates were *not* fair, just,

and reasonable, and that Order No. 11-520 is inconsistent with prior agency practice.

The PUC and PGE respond that petitioner's argument was appropriately rejected in Order No. 11-520 because the PUC has broad discretion in setting rates, subject to statutory and constitutional constraints, and the PUC did not abuse that discretion by allowing PGE to recover costs that were part of PGE's reasonable operating expenses. We agree.

The PUC is responsible for "establishing fair and reasonable rates" for services provided by public utilities. ORS 756.040(1). It may not authorize a rate or schedule of rates "that is not fair, just and reasonable." ORS 757.210(1). Ratemaking involves "the PUC's exercise of considerable discretion to balance the interests of utility investors and customers and the public in general." *Gearhart I*, 255 Or App at 60-61. Setting rates is a quasi-legislative function that is governed by statute but largely left to the PUC's discretion. *Gearhart II*, 356 Or at 221. The governing statutes direct the PUC "to examine three key components in rate-making"—a utility's operating expenses, adequate revenue for the capital costs of the utility, and the rate of return on the utility's capital investment. *Id.* at 220. In calculating rates, "there is no single correct sum, but rather a range of reasonable rates." *Id.* However, the PUC does not have discretion to misinterpret or misapply the law, and we will not affirm if the formula used by the PUC was based on an erroneous interpretation of the law, or was specifically precluded by some source of law. *Wah Chang v. PUC*, 256 Or App 151, 162, 301 P3d 934 (2013).

Because the PUC has broad discretion in setting rates, because a utility's operating expenses are explicitly considered as a component of ratemaking, and because petitioner has not identified any statutory or constitutional constraints that would preclude the PUC from considering administrative costs in setting rates, we reject petitioner's assertion that the rates approved in Order No. 11-520 are not fair, just, and reasonable. It was within the PUC's discretion to approve rates that allowed PGE to recover the costs of administering the refund, and the PUC adequately

explained its rationale for doing so. We also find nothing in the record to substantiate petitioner's assertions that the PUC impermissibly shifted the burden or acted inconsistently with prior agency practice.

### 4. *Unclaimed Refund Checks*

Petitioner raises various arguments relating to $770,985 in refund checks that were never cashed by the recipients. Petitioner frames the error as the failure of the PUC to require PGE to "forfeit" the amount "it retained for uncashed refund checks." In support, petitioner argues that PGE should have to pay interest on any funds it held in its account, and that, in remitting the unclaimed refund amounts to the Oregon Department of State Lands, PGE failed to comply with various requirements of Oregon's Unclaimed Property Act. *See* ORS 98.302 - 98.436.

In Order No. 11-520, the PUC addressed the very narrow issue of whether PGE was required to offset the unclaimed refund amounts against the costs of administering the refund. The PUC concluded that unclaimed property laws required PGE to remit those amounts to the various states in which the intended recipients lived. Accordingly, the PUC concluded that those amounts could not be used to offset PGE's administrative costs.

We conclude that the PUC properly decided the narrow issue that was before it. Petitioner's complaint about PGE's noncompliance with unclaimed property laws fails to identify any legal basis that supports the conclusion that PGE's administrative costs should have been offset by the unclaimed refunds, or that PGE must "forfeit" those amounts. And that was the narrow issue before the PUC—whether PGE should be allowed to recover the costs of administering the refund. Accordingly, we reject petitioner's asserted error regarding unclaimed refund checks.

### 5. *Earnings Test*

Petitioner challenges the "earnings test" used by the PUC in evaluating PGE's request to recover the administrative costs. ORS 757.259(5) allows the PUC, in limited circumstances, to exercise its discretion to defer expenses

or revenues to a subsequent rate or rate schedule through amortization "only to the extent authorized by the commission in a proceeding under ORS 757.210 to change rates and upon *review of the utility's earnings* at the time of the application to amortize the deferral." The PUC, through OAR 860-027-0300(9), requires a utility seeking to amortize deferred costs to

"provide the Commission with its financial results for a 12-month period or for multiple 12-month periods to allow the Commission to perform an earnings review. The period selected for the earnings review will encompass all or part of the period during which the deferral took place or must be reasonably representative of the deferral period."

In part, the purpose of an earnings test is to allow the PUC to inquire whether "the extraordinary measure of amortization of the deferred amount is justified, *i.e.*, despite the deferred costs or revenue, did the utility earn a reasonable return on its equity during the period of the deferral and did ratepayers pay an appropriate rate for services received?" *Utility Reform Project v. PUC*, 261 Or App 388, 401, 323 P3d 430, *rev den*, 356 Or 517 (2014).

Here, the PUC reviewed PGE's earnings for a 12-month period in 2009 and 2010. Petitioner argues that ORS 757.259(5) required the PUC to review PGE's earnings "at the time of the application to amortize the deferral," which, in this case, was February 2011. That is, petitioner asserts that the PUC must review PGE's earnings during the period of amortization and that, because PGE's earnings in February 2011 were "far in excess of its authorized rate of return," if the PUC had conducted an earnings test as of February 2011, amortization of the deferred administrative costs would have been "negated."

The PUC interprets ORS 757.259 to allow it to look at a utility's earnings during the period of the deferral, rather than during the period of time that the application for amortization is filed. In the PUC's view, the statutory language merely requires it to conduct an earnings test at the time of the application, but does not require it to include the time period of the application in its earnings review.

We recently rejected a similar argument by petitioner in an unrelated case that involved the same parties. *Utility Reform Project*, 261 Or App at 402. That case involved petitioner's request that PGE defer federal and state taxes that were collected from ratepayers in 2005, but unpaid by PGE, for amortization in future rates. Petitioner questioned the PUC's consideration of PGE's earnings during a period that did not include the time period of the request to amortize the deferred revenue or the most recent period for which earnings data was available. We adopted the PUC's interpretation of the statute, concluding that, under ORS 757.259(5), "although *the review* of the utility's earnings is to take place at the time of the request for amortization, the earnings to be reviewed are not mandated for any particular time period and are those that the PUC determines in its discretion are relevant to the particular deferral and amortization." *Id.* at 397 (emphasis in original). In short, we rejected the same argument that petitioner makes in this case—that the statute requires the PUC to include the date that a request of amortization is made in the earnings test. We adhere to that rationale and reject petitioner's argument here. Further, we conclude that the PUC did not abuse its discretion in this instance by using a 12-month period in 2009 and 2010 in its earnings review.

B. *Substantial Evidence*

Finally, petitioner appears to argue that Order No. 11-520 is not supported by substantial evidence or substantial reason insofar as it allows PGE to recover certain costs that, petitioner asserts, were unreasonable or unnecessary. Under ORS 183.482(8), we must "set aside or remand [the PUC's] order if the court finds that the order is not supported by substantial evidence in the record." Substantial evidence supports the PUC's findings "when the record, viewed as a whole, would permit a reasonable person to make that finding." *Id.* The crux of petitioner's complaint seems to be that the PUC did not address petitioner's arguments that some of PGE's costs were unreasonably incurred. We conclude that Order No. 11-520 adequately sets forth the PUC's basis for concluding that PGE's costs were reasonably incurred (including, specifically, the PUC's determination that,

although PGE's refund mechanism was not the cheapest available, the additional cost was justified by the benefits, including greater efficiency and customer participation).

Affirmed.